ESTATE OF ALEXANDER J. SHAMBERG, DECEASED, ISIDOR W. SHAM-BERG, ADMINISTRATOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 107713. Promulgated January 28, 1944.

*Julius Henry Cohen, Esq., Lewis L. Delafield, Jr., Esq.,* and *Austin J. Tobin, Esq.,* for the petitioner.

*J. P. Wenchel, Esq., Mason B. Leming, Esq., Edwin M. Perkins, Esq., W. T. Plumb, Jr., Esq.,* and *Richard Flesch, Esq.,* for the respondent.

#### OPINION.

OPPER, *Judge*: This proceeding involves deficiencies determined against petitioner's decedent in income tax for the years 1937 and 1938 in the sums of $1,580 and $913.02, respectively. The deficiencies rest upon the failure to include in his taxable income for those years

interest received by the decedent on bonds issued by the Port of New York Authority.

The parties have submitted an extensive stipulation of facts, all of which we hereby find accordingly. They may be briefly summarized:[1]

Efficient handling of freight and passenger traffic, into, out of, and within the geographical territory surrounding New York City, highly important to the many inhabitants of the region, is complicated by various waterways interspersing it. Early efforts to attain unified traffic control were restricted at the outset by the dual jurisdiction of New York and New Jersey.

Mutual endeavor led to a compact approved by the legislatures of the two states[2] and Congress,[3] designed to assure the cooperation of the two states in the development of the Port of New York. This compact created the Port of New York Authority, a body politic and corporate, which was to develop the port on a self-liquidating financial basis.

The compact created the Port of New York District, required individual and specific legislative approval of the projects of the Port Authority, and made them subject to regulatory laws and regulating commissions as if owned by a private corporation. The District comprises territory in both the States of New York and New Jersey, and the waters between them. Within its limits are located the cities of New York, Yonkers, Jersey City, Newark, Elizabeth, Paterson, and Passaic, and approximately two hundred other separate municipalities. The powers of any municipality to develop or improve port and terminal facilities were left unimpaired.

Pursuant to the compact a comprehensive plan of port development was recommended by the Port Authority, which received the required approval by the legislatures in 1922,[4] and to which Congress[5] gave its consent, conditioned upon the approval by the War Department of specific projects affecting navigable waters.

Initial costs of the construction by the Port Authority of the Lincoln vehicular tunnel, connecting Manhattan and Jersey City, were financed by the sale in 1933 of "Midtown Hudson Tunnel Notes," of which the greater part were taken by the United States through the Federal Emergency Administration of Public Works. In entering into this agreement the Public Works Administration required and received the opinion of the Port Authority's general counsel that its notes were exempt from state and Federal taxation. These notes were

[1] For a much more comprehensive historical and factual statement, see *Montgomery B. Case*, 34 B. T. A. 1229, 1230–1243.
[2] Ch. 154, Laws of New York, 1921; ch. 151, Laws of New Jersey, 1921.
[3] Pub. Res. No. 17, 67th Cong., (S. J. Res. 88).
[4] Ch. 43, Laws of New York, 1922; ch. 9, Laws of New Jersey, 1922.
[5] Pub. Res. No. 66, 67th Cong., July 1, 1922.

retired in 1935 by the sale of a larger bond issue called "General and Refunding Bonds First Series." Bonds of this series were held by petitioner's decedent.

Concurrent legislation in 1931 provided that the Port Authority issue its bonds, secured by the tolls from the Holland Tunnel—also running from Manhattan to Jersey City under the Hudson River—to repay New York and New Jersey for their original expenditures in constructing this tunnel. This was done by the sale of an issue known as "Interstate Bridge and Tunnel Bonds, Series E." Bonds of this issue were also held by petitioner's decedent during the taxable period in question.

By further concurrent legislation in 1931[6] the states provided that "the construction, maintenance, operation and control of all such bridges and tunnels, heretofore or hereafter authorized by the two States, shall be unified under The Port of New York Authority * * * to the end that the tolls and other revenues shall be applied, so far as practicable, to the costs of the construction, maintenance and operation of said bridges and tunnels as a group and economies in operation effected, it being the policy of the two States that such bridges and tunnels shall as a group be in all respects self-sustaining."

The Port Authority has no stock but is wholly owned by the States of New York and New Jersey. Its projects are operated in the interests of the public and no profits inure to the benefit of private persons. Its functions and powers are exercised by twelve commissioners, half of whom are appointed from the resident voters of each state by the respective governors. Petitioner's decedent was one of the New York commissioners during the years in controversy. It has been the invariable practice of commissioners to take an oath of office and they may not be removed except upon charges and after a formal hearing.

The actions of the commissioners are binding only after approval of the majority of the commissioners from each state. The minutes of every meeting are required to be sent immediately to the governor of each state, who possesses a veto power over the acts of any of the commissioners from his state. Reports on all activities of the Authority are required to be submitted annually to the legislatures and governors.

The Authority fixes the tolls charged for the use of its facilities with a view to meeting operating expenses and interest and amortization obligations. By legislation it has been provided that its revenues be first expended in payment of operating expenses, interest, sinking and reserve fund requirements of bond issues, and amounts currently due to each state for advances; after the payment of these items the states direct that there shall be built up a "General Reserve Fund"

---

[6] Ch. 4, Laws of New Jersey, 1931; ch. 47, Laws of New York, 1931.

equal to one-tenth of the amount of all outstanding bonds, surplus to be used for such purpose as may be directed by the states.

The revenues from the various facilities during the year 1941 after deduction of operating expenses were as follows:

| | |
|---|---|
| Arthur Kill Bridges | $439,402.44 |
| George Washington Bridge | 4,456,548.98 |
| Bayonne Bridge | 287,364.71 |
| Holland Tunnel | 5,899,480.72 |
| Lincoln Tunnel | 2,044,348.34 |
| Inland Terminal | 724,913.23 |

In *Helvering* v. *Gerhardt*, 304 U. S. 405, the Supreme Court held that the salaries of certain employees of the Port of New York Authority were subject to Federal taxation. In this proceeding respondent seeks to reach a similar result with respect to interest received by holders of the Port Authority's obligations. The case has been presented to raise both the constitutional issue and the question of statutory construction posed by the following provision of the applicable revenue acts:

SEC. 22. GROSS INCOME.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this title:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) TAX-FREE INTEREST.—Interest upon (A) the obligations of a State, Territory, or any political subd¹⁻ˢion thereof \* \* \*.

We shall consider the latter question first, for "the Congress has the power and may have intended to exempt agencies of the states other than those which would fall within the protection of the constitutional principle." 38 Op. Atty. Gen. (1937), pp. 563, 564, *infra*. Obviously the controversy arises as to whether the Port Authority is a "political subdivision" of "a State." If it is, the statute stands squarely in the path of respondent's attempt to tax this interest.

On this branch of the case, respondent relies in part upon a single sentence in the *Gerhardt* opinion in which the Court, referring to a regulation issued under the 1932 Act, expresses the view "that employees of the Port Authority are nòt employees of the state or a political subdivision of it within the meaning of the regulation as originally promulgated—an additional reason why the regulation, even before the 1938 amendment, was ineffectual to exempt the salaries here involved." [7] Without pausing to consider whether this is decision

---

[7] "\* \* \* The applicable provisions of § 116 of the 1932 Act do not authorize the exclusion from gross income of the salaries of employees of a state or a state-owned corporation. If the regulation be deemed to embrace the employees of a state-owned corporation such as the Port Authority, it was unauthorized by the statute. But we think it plain that employees of the Port Authority are not employees of the state or a political subdivision of it within the meaning of the regulation as originally promulgated—an additional reason why the regulation, even before the 1938 amendment, was ineffectual to exempt the salaries here involved." [304 U. S., p. 423.]

or dictum, a question much controverted by the parties, we think its meaning is necessarily to be discerned only by reference to the context of the statement and to the regulation which the Court was there con struing. The statement comes near the close of the opinion, after an initial reference to a predecessor regulation in the following words:

> * * * In *Brush* v. *Commissioner. supra* [300 U. S. 352], the applicable treasury regulation upon which the Government relied exempted from income tax the compensation of "state officers and employees" for "services rendered in connection with the exercise of an essential governmental function of the State." The sole contention of the Government was that the maintenance of the New York City water supply system was not an essential governmental function of the state. The Government did not attack the regulation.

This regulation in terms exempts only employees of a state or political subdivision who render "services * * * in connection with the exercise of an essential governmental function of the State or political subdivision." That juxtaposition of the terms gives color to the view that in the regulation the concept of an employee of a "political subdivision" must be viewed as limited to one carrying out for the state or subdivision the kind of governmental function which is of the essence of sovereignty.

Such a strict construction of the term "essential governmental function" is adhered to consistently in the *Gerhardt* opinion. For example, in referring to *Collector* v. *Day*, 78 U. S. 113, the explanation given is that:

> * * * It is enough for present purposes that the state immunity from the national taxing power, when recognized in *Collector* v. *Day, supra,* was narrowly limited to a state judicial officer engaged in the performance of a function which pertained to state governments at the time the Constitution was adopted, without which no state "could long preserve its existence."

and that:

> * * * The immunity which it implied was sustained only because it was one deemed necessary to protect the states from destruction by the federal taxation of those governmental functions which they were exercising when the Constitution was adopted and which were essential to their continued existence,

while *South Carolina* v. *United States*, 199 U. S. 437; *Ohio* v. *Helvering*, 292 U. S. 360, and *Helvering* v. *Powers*, 293 U. S. 214, were decided as they were "because it was thought that the functions discouraged by these taxes were not indispensable to the maintenance of a state government. * * *"

At another point, in discussing the "constant expansion of government activities," the Court refers to the essential function test as "dependent upon the nature of the function being performed by the state or in its behalf," which in the Court's view "excludes from the immunity activities thought not to be essential to the preservation of

state governments even though the tax be collected from the state treasury." It comments:

* * * With the steady expansion of the activity of state governments into new fields they have undertaken the performance of functions not known to the states when the Constitution was adopted, and have taken over the management of business enterprises once conducted exclusively by private individuals subject to the national taxing power * * *. But if every federal tax which is laid on some new form of state activity * * * were to be set aside as an infringement of state sovereignty, it is evident that a restriction upon national power, devised only as a shield *to protect the states from curtailment of the essential operations of government which they have exercised from the beginning*, would become a ready means for striking down the taxing power of the nation. [Emphasis added.]

But in the same portion of the opinion the Court had already concluded that:

* * * The challenged taxes * * * are upon the net income of respondents, derived from their employment in common occupations [construction engineer and assistant general manager] not shown to be different in their methods or duties from those of similar employees in private industry,

and that:

* * * A non-discriminatory tax laid on their net income, in common with that of all other members of the community, could by no reasonable probability be considered to preclude the performance of the function which New York and New Jersey have undertaken * * * it does not curtail any of those functions which have been thought hitherto to be essential to their continued existence as states.

We are not called upon in discussing this branch of the present proceeding to consider whether such a subdivision would partake of the state's constitutional immunity from taxation; nor in fact whether there is any such immunity in the absence of a statutory barrier; nor whether the "essential function" test is the one necessarily to be employed in the consideration of the constitutional question. But, in the light of the Court's discussion of these matters, it is only reasonable that it should have concluded in its consideration of the regulation involved in the *Gerhardt* case that taxation of the employees before it there did not involve interference with the exercise of an essential governmental function of the state or any political subdivision and, accordingly, that they were "not employees of the state or a political subdivision of it," the Court adding significantly "within the meaning of the regulation."

All of this discussion was engendered, not by a statutory provision, but by an administrative interpretation of legislation; there was not, and had not been since its disappearance in 1918,[8] an express exemption of salaries comparable to the one explicitly dealing with interest.

---

[8] Revenue Act of 1918, sec. 213. See footnotes 11 and 12, *infra*.

On the other hand, the statute which we have to construe here includes, in that explicit exemption, no such reference to the exercise of an "essential" governmental function as occurs in the regulation dealing with salaries; and, as will presently appear, there is nothing in the legislative history, nor in the definitions [9] of the term "political subdivision," which can justifiably so narrow the scope of the term as to include only activities considered to be essential to the maintenance of state sovereignty.

And in explicitly [10] refusing to consider in the *Gerhardt* case the extension of the doctrine of immunity beyond the payment of salaries, the Court there took a position so inconsistent with the assumption that in its construction of the regulation dealing with salaries it was nevertheless passing on the scope of the definition of "political subdivision" in the provision exempting interest, that we are unable to attach to the passage relied upon by respondent the significance to which he insists it is entitled. In our view the term "political subdivision," as used in the statute before us, must be construed without the benefit of any light from the *Gerhardt* case and only by reference to such conventional aids to statutory construction as are at hand.

It may be recognized at the outset that the term has varying meanings in different contexts. But the legislative and administrative history of the exempting provision indicates that the words were used there in the broadest sense.

The language [11] appeared in the first revenue act enacted after the adoption of the Sixteenth Amendment. This measure, incorporated in the Tariff Act of 1913, was sponsored by Mr. Cordell Hull, then a member of the House of Representatives. He described the purpose

---

[9] Including respondent's regulations which, as in effect during the years involved, provided:

"Interest upon the obligations of a State, Territory, or any political subdivision thereof, or the District of Columbia is exempt from the income tax. Obligations issued by or on behalf of the State or Territory or a duly organized political subdivision acting by constituted authorities empowered to issue such obligations, are the obligations of a State or Territory or a political subdivision thereof. * * * The term 'political subdivision,' within the meaning of the exemption, denotes any division of the State or Territory which is a municipal corporation, or to which has been delegated the right to exercise part of the sovereign power of the State or Territory. As thus defined, a political subdivision of a State or Territory may [or may not], for the purpose of exemption, include special assessment districts so created, such as road, water, sewer, gas, light, reclamation, drainage, irrigation, levee, school, harbor, port improvement, and similar districts and divisions of a State or Territory." Regulations 101 (1938), art. 22 (b) (4) (1). The words in brackets were added for the first time in the cited regulation, but respondent observes in his brief "but no significance is attached to the insertion of the words 'or may not' so far as the instant case is concerned."

[10] "Expressing no opinion whether a federal tax may be imposed upon the Port Authority itself with respect to its receipt of income or its other activities * * *" [304 U. S., p. 424.]

[11] "Subdivision 2 * * *

"(B) * * * That in computing net income under this section there shall be excluded the interest upon the obligations of a State or any political subdivision thereof * * * and the compensation of all officers and employees of a State or any political subdivision thereof except when such compensation is paid by the United States Government."

on the floor of the House (50 Cong. Rec. 508) as "not desiring to raise any constitutional question or to arouse the antagonism of any of the States, this provision was inserted." [12]

In 1918, when the exigencies of an earlier war led to a reconsideration of the exemptions of both salaries and interest, a proposal for their elimination received serious attention, particularly one accepted by the Ways and Means Committee of the House which limited the interest exemption to obligations "issued on or prior to the date of this act."

There was much debate on the floor and several amendments to eliminate the tax on both salaries and interest from State sources were offered and rejected. The bill, as reported by the Senate Committee on Finance, had stricken from it the provisions with respect to a tax on the interest of State and municipal obligations and was silent as to the salaries of State and municipal officials. The committee's explanation was as follows:

> The committee amended 213a so as to require that any gains, profits, and income derived from salaries * * * be subject to income tax, *leaving the constitutional question as to the authority of Congress to tax certain salaries to be settled by the courts* in any case in which the question may be raised. [Emphasis added.]
>
> The provision subjecting the interest on new issues of State and municipal bonds to taxation as income was also stricken out. Apart from the constitutional question, it seemed unwise for Congress to attempt to impose this tax upon the obligations of States and municipalities as long as the States are not free to tax in a similar manner the obligations of the United States.

After debate in the Senate, it was finally passed as recommended by the Finance Committee. Thus the Revenue Act of 1918, as finally enacted, included taxation of Federal officials and employees, but said nothing expressly one way or the other about salaries of State and municipal officers and employees. The act expressly exempted interest on State and municipal obligations. [13]

In the year following the adoption of the 1913 Act, the Attorney General, in response to a request from the Secretary of the Treasury, issued an opinion as to the sense in which the words in question were used. 30 Op. Atty. Gen. (1914), p. 252. He there said:

> The term "political subdivision" is broad and comprehensive and denotes any division of the State made by the proper authorities thereof, acting within their constitutional powers, for the purpose of carrying out a portion of those functions of the State which by long usage and the inherent necessities of government have always been regarded as public. The words "political" and "public" are synonymous in this connection. (Dillon Municipal Corporations, 5th ed., sec. 34). It

---

[12] Referring to the cognate provision exempting salaries, which disappeared in 1918 (see footnote 8, *supra*), he said:

"In view of the long line of court decisions to the effect that the Government has no more power to tax the instrumentalities of a State than a State has to tax the instrumentalities of the National Government. Now, while individually speaking, I, as well as each Member here, has his opinion as to what might or might not be done in that respect at this time, still it was not the desire of those who have been taking the most interest in this measure to inject any more constitutional questions or controversies into the bill, especially for the sake of only a few thousand dollars in taxes, and it would only add a few thousand dollars if that clause was included." [50 Cong. Rec. 1262.]

[13] Testimony of Assistant Attorney General Morris, Hearings, Committee on Ways and Means, 76th Cong., 1st sess., pp. 47, 48.

is not necessary that such legally constituted "division" should exercise all the functions of the State of this character. It is sufficient if it be authorized to exercise a portion of them. * * *

* * * * * * *

The purposes to which you refer, namely, the improvement of streets and public highways, the provision of sewerage, gas, and lights, the reclamation, drainage, and irrigation of considerable districts of land, are clearly public and have always been so treated.

The opinion quoted from a then recent case, *Little* v. *Williams*, 231 U. S. 335, which dealt with an Arkansas levee district invested with taxing powers:

The district was a mere political subdivision of the State, created by the latter * * * It was essentially a subordinate agency of the State, was exercising a power of the State for its convenience, could have no will contrary to the will of the State, held its property and revenue for public purposes, and was in all respects subject to the State's paramount authority. * * *

A request for reconsideration of the question by the present Secretary of the Treasury, Mr. Morgenthau, resulted in a reaffirmance of this position in an opinion at 38 Op. Atty. Gen. (1937), p. 563, *supra*, containing the following language:

The term "political subdivision" may be used in statutes in more than one sense. It may designate a true governmental subdivision such as a county, township, etc., or, as held in the Attorney General's opinion under consideration, it may have a broader meaning, denoting any subdivision of the state created for a public purpose although authorized to exercise a portion of the sovereign power of the state only to a limited degree.

In the same opinion the Attorney General points out:

It appears that the Treasury Department has followed the Attorney General's opinion in the administration of the income tax laws since 1914 * * *.

Under such circumstances the repeated reenactment of the exemption provision without substantial change can "be taken as indicating a purpose to continue in force the existing law as interpreted by the Attorney General (*United States* v. *G. Falk & Bro.*, 204 U. S. 143) * * *." *Provost* v. *United States*, 269 U. S. 443. 458.

In pressing for legislation which would remove the statutory exemption, representatives of the Department of Justice [14] took the view

---

[14] The Treasury was also represented:

"Interest derived from State and municipal securities is still, however, excluded by the Revenue Act of 1938 from gross income and has been since the income-tax law of 1913.

"Why is this *statutory* exemption needed?

"Those who oppose the President's proposal to repeal this statutory exemption know full well that so long as it stays in the Revenue Act the Supreme Court will never have the opportunity of considering whether interest on State and municipal securities is taxable or tax-exempt under the Constitution. *That is why this statutory exemption is needed.*

"No principle of constitutional law requires a special statutory provision to make it effective. Every constitutional prohibition is self-executing.

"Can it be that those who say there is a constitutional immunity have no confidence in their own position?" [Statement of John Philip Wenchel, Chief Counsel, Bureau of Internal Revenue, Hearings before the Special Committee on Taxation of Governmental Securities and Salaries, U. S. Senate, 76th Cong., 1st sess., p. 65.]

that the existence of the provision under discussion eliminated the possibility of litigating the fundamental constitutional question raised in these proceedings. Assistant Attorney General (now Justice) James W. Morris testified in 1939 before a Senate committee that:

* * * only by such legislation [the proposed amendment] can the question be settled as to whether or not, under the Constitution as it now stands, such income can be taxed. [Hearings before the Special Committee on Taxation of Governmental Securities and Salaries, U. S. Senate, 76th Cong., 1st sess., p. 59.]

This was the reiteration of a view expressed in the previous year in a study of the subject made by the Department of Justice at the request of the Treasury Department, in the course of which, after a reference to *Helvering* v. *Gerhardt*, *supra*, to the effect that "the opinion seems broad enough to cover all employees of states and municipalities," the Assistant Attorney General states that:

But, even if there were greater doubt as to the final solution of these constitutional problems, the legislation recommended by the President [eliminating the statutory exemption] would still seem to be justified. For only by such legislation can these questions be settled. ["Taxation of Government Bondholders and Employees—The Immunity Rule And The Sixteenth Amendment— A Study Made By The Department of Justice" pp. VIII, X, XI.]

As matters ultimately developed, Congress turned a deaf ear to these requests. The only legislative result was the Public Salary Tax Act, which omitted all reference to interest. But that is a matter of little moment, since the years before us are 1937 and 1938, and if legislation terminating the interest exemption had been enacted pursuant to the President's recommendation, it would have been prospective only.[15] The exemption provision contained in the 1936 and 1938 Acts, carried over in substantially identical form from all prior acts, is the one applicable here. It was itself the cause for these efforts of administrative officers to bring about its elimination.

It is true, of course, that neither in the legislative nor in the administrative history is there a direct reference to public authorities or districts as political subdivisions, although indirect references are not lacking. E.g., *Leon S. Moisseiff*, 21 B. T. A. 515. But the political device known as the Authority has come to be well and generally known.[16]

---

[15] "Such legislation can, I believe, be enacted by a short and simple statute. It would subject all future state and local bonds to existing Federal taxes; * * *" [Message to Congress, April 25, 1938.]

[16] "* * * The conspicuous success of the Port of New York Authority has made fashionable the title of 'Authority' [*] but special corporations with corresponding functions were well-known before 1921." [Williams and Nehemkis, "Municipal Improvements as Affected by Constitutional Debt Limitations," *infra*, p. 201.] At the point marked with an asterisk there is a reference to a footnote reading in part as follows:

"See, for example, Allegheny County Authority [Pa. Stat. (Purdon, 1936) tit. 16, § 4160–1] ; California Toll Bridge Authority (Cal. Stat. 1929, c. 763) ; Hackensack River Sewerage Authority (N. J. Laws 1933, c. 373) ; Savannah Port Authority [Ga. Code Ann. (Michie, 1926) § 6563] ; Chesapeake Bay Authority (Md. Laws 1935, c. 330) ; Mackinac

In no material respect do its characteristics and purposes differ from the special improvement districts known to the lawmakers of earlier days and dealt with in both Attorney General's opinions.

The public corporation, i. e., the "authority" or "district," organized especially to carry out a revenue-producing improvement and issuing its own general obligations secured exclusively by a pledge of the revenues of the improvement * * * [is] the converse of the special obligation of the municipal corporation. * * * The "District" has long been associated with irrigation projects of the western states, the building of levees along the Mississippi River as well as municipal improvement generally.

The early special districts were dependent for their financing upon taxes and special assessments * * * Where substantial improvement areas were involved, the tax district was enlarged to include the county or other unit of government embracing the affected area. Under an Act of the Alabama Legislature in 1860, "For the improvement of the Bay and Harbor of Mobile," the Board of Harbor Commissioners financed the project out of the proceeds of county bonds. Connecticut in 1895 enacted a statute whereby several towns were constituted a corporation under the name of the "Connecticut River Bridge and Highway District" "for the construction, reconstruction, care and maintenance of the free public highway across the Connecticut River." Bonds issued by the district were serviced from the general taxes of the several towns constituting the district.

\*       \*       \*       \*       \*       \*       \*

The distinctively modern special corporation differs from its predecessor principally in respect to method of financing; its obligations are payable solely from the revenues or property, or both, of a utility which it operates, no power to levy taxes or special assessments being available. [Williams and Nehemkis, "Municipal Improvements as Affected by Constitutional Debt Limitations," 37 Col. Law Rev., 177, 201.]

That the New York Port Authority itself falls within the Attorney General's requirement that it be constituted by the proper authorities of the state for the purpose of carrying out some of its public functions and within respondent's regulation calling for a "division of the

---

Bridge Authority (Mich. Pub. Acts 1934 Extra Sess., no. 35) ; International Bridge Authority (Mich. Pub. Acts 1935, no. 237) ; The General State Authority (Pa. Laws 1935, no. 2514) ; The Guadaloupe River Authority (Tex. Gen. Laws 1933 1st C. Sess., c. 75) ; Lower Neches Valley Authority (Tex. Gen. Laws 1933 1st C. Sess., c. 63, as amended by Gen. Laws 1934, 4th C. Sess., c. 17) ; Lower Colorado River Authority (Tex. Gen. Laws 1934, 4th C. Sess., c. 7) ; Great Basin Authority (Utah Laws 1935, c. 231).

\*       \*       \*       \*       \*       \*       \*

"Municipal improvement authorities authorized to accomplish a variety of purposes obtain in several states. E.g., Ala. Gen. Acts 1935, no. 40 (improvement authorities to furnish water, sewerage, telephone, gas or electric heat, light or power services) ; Fla. Laws 1935, c. 1010 (development authorities for counties—toll bridges, highways, public parks and places of amusement, public buildings and community centers, public utilities furnishing electric energy, water gas, and telephone service, housing facilities) ; Pa. Laws 1933–34 Spec. Sess., no. 30 (counties of second class created authorities to construct, maintain and operate bridges, tunnels, streets, highways, traffic distribution circles, airports, hangars, parkways recreation grounds and facilities, public parks, swimming pools, lakes, dams) ; Pa. Laws 1935, no. 2513 (authorizing the incorporation as bodies corporate and politic of authorities for any county, city, town, borough or township to construct, improve, maintain and operate bridges, tunnels, streets, highways, parkways, traffic distribution centers, traffic circles, parking spaces, airports, hangars, low cost housing projects, parks, recreation grounds and facilities, sewers, sewer systems, sewage treatment works, swimming pools, play-grounds, lakes, low head dams, hospitals and subways) ; S. D. Laws 1935, c. 172 (improvement authorities to furnish water, sewerage, gas or electric heat, light or power)."

State  *  *  *  to which has been delegated the right to exercise part of the sovereign power of the State," as well as within the definition in *Little* v. *Williams, supra,* of a subordinate agency of the state exercising a power of the state for its convenience and holding its property and revenue for public purposes, can not, we think, be doubted.

 *  *  *  Its projects are all said to be operated in behalf of the two states and in the interests of the public  *  *  *  The Joint Resolution of Congress consenting to the comprehensive plan of port improvement  *  *  *  declares that the activities of the Port Authority under the plan "will the better promote and facilitate commerce between the States and between the States and foreign nations and provide better and cheaper transportation of property and aid in providing better postal, military, and other services of value to the Nation." Statutes of New York and New Jersey  *  *  *  declare that they are "in all respects for the benefit of the people of the two States, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions, and the Port Authority shall be regarded as performing a' governmental function  *  *  *." [*Helvering* v. *Gerhardt, supra,* p. 409–410.]

It is stipulated in this proceeding that:

1. The Port of New York Authority  *  *  *  is a body politic and corporate, the joint agency of the States of New York and New Jersey  *  *  *.

2. The compact was entered into to secure the cordial cooperation of the States of New York and New Jersey in the development of the Port of New York, and to establish a joint or common agency with a borrowing power independent of State and municipal debt limitations, as the best means to accomplish such cooperation of the two States and to effectuate the development of the port on a self-liquidating basis.[17] The States recite in the Compact the great growth of commerce in the Port of New York and the benefit of their cordial cooperation in the formulation and execution of necessary physical plans through a joint agency and in the encouragement of capital investment in the Port District.

 *  *  *  *  *  *

5. By the said Compact, Article II, the two States created a district to be known as the "Port of New York District" with boundaries described in particularity in the compact by metes and bounds.

 *  *  *  *  *  *  *

30. In the Comprehensive Plan the two States called upon the Port Authority to provide tunnels and bridges connecting New York and New Jersey, suitable markets, union inland terminal stations and warehouses  *  *  *

---

[17] Port improvement has long been recognized as a public activity:

"*  *  *  On any broad consideration it may reasonably be considered as a usual governmental function of a state.

"The essence of port and harbor development is to provide adequate terminal facilities. Historically, port activities have been shown to be almost universally, directly subject to the supervision of agencies of government.  *  *  *  Illustrations of these are the Hamburg and Northern European ports.  *  *  *  The French ports follow a standardized pattern developed by the central government and are provided for by legislation.  *  *  *  Intrusting the regulation and operation of terminal facilities of a port to a central public agency is not unusual in England; nor in Scotland. In the Dominion of Canada, it is likewise regarded as a usual governmental function, as illustrated by the operation and development of the Port of Montreal.

"*  *  *  Other states of the Union have entrusted the development and regulation of port facilities to governmental agencies. The federal government has recognized the need of direct governmental control and operation of port facilities in the Panama Canal Zone, where it operates and controls directly all the piers, wharves, warehouses, and storage facilities both at Colon and at the Pacific terminus of the Canal." [*Commissioner* v. *Ten Eyck* (C. C. A., 2d Cir.), 76 Fed. (2d) 515, 517, 518.]

It is true that one of the sovereign functions of the state, the power to levy taxes and assessments, is expressly withheld from the New York Port Authority, and from authorities generally as typically constituted. But it is endowed with the power of eminent domain, and with certain police powers, including the promulgation and enforcement of regulations for the conduct of navigation and commerce in the area defined as the Port of New York District.

> * * * the Port Authority maintains a uniformed police force who are designated by statute as regular peace and police officers of both states with the usual police power to make arrests and issue summons. [*Montgomery B. Case*, 34 B. T. A. 1229, 1235.]

The laws of New York purport to grant the Authority the power of subpoena. Its employees are permitted by statute to join the State Employees' Retirement System. Expenses of construction and operation were originally defrayed by the appropriation of public funds by joint action of New York and New Jersey. And both states have vested it "with all necessary and appropriate powers not inconsistent with the Constitution of the United States or of either state" to effectuate the interstate treaty "except the power to levy taxes or assessments." The police power and the power of eminent domain are, with the power of taxation, referred to by the New York Court of Appeals as "rights inherent in the state as sovereign * * *. They belong to the state because it is sovereign, and they are a necessity of government. The state cannot surrender them, because it cannot surrender a sovereign power." *People* v. *Adirondack Railway Co.*, 160 N. Y. 225; 54 N. E. 689; affd., 176 U. S. 335. And if reference to the taxing power is significant as evidence of the Authority's character in the view taken by its creators, the express exclusion of permission to tax from the powers granted to it is as readily explained by the manifest intention that its projects shall be designed on a self-liquidating basis as by any putative doubts as to the public nature of its purposes or organization, or as to the reality of its governmental nature.

> The fact that the authority lacks recourse to the credit of the municipality or the state, or stands on its own feet supported by its own general credit, scarcely eliminates it as a vital function of contemporary local governmental borrowing. Recent experience has increasingly demonstrated that when the margin of borrowing permitted to the States and municipalities under the constitution is absorbed, the authority becomes the only available credit base with which local government is able to finance improvement projects. * * * [Nehemkis, "The Public Authority: Some Legal and Practical Aspects," 47 Yale Law Journal, 14, 26.]

In *Montgomery B Case*, 34 B. T. A. 1229, 1247, the affirmance of which at 92 Fed. (2d) 999, *sub nom Commissioner* v. *Gerhardt*, was reversed in *Helvering* v. *Gerhardt*, *supra*, the Board of Tax Appeals determined that the New York Port Authority was "engaged in the

performance of a sovereign function of each of the states of New York and New Jersey. * * * ." We do not view the reversal as impairing the force of that conclusion. On the contrary, the Supreme Court there evidently assumed that the two states were discharging a public function through the instrumentality of a subdivision embracing the territory within the Port of New York District, which was created by political means, and the purposes of which were the general benefit and welfare of the public as a whole.

We think it follows that the attribute of taxation is but one of the many tests by which Congress intended a political subdivision to be identified [18] and that there could have been no more intention to exclude the public authority with its manifold influence in the whole field of local public improvement [19] than the special assessment district. Cf. 30 Op. Atty. Gen. 252, and 38 Op. Atty. Gen. 563, *supra*.

For example, the great "motor age" of the last quarter century [20] called in no small degree for the development of great highway and parkway systems through the combined efforts of Federal and local governments. The future may see an even greater need for the creation of local facilities adapted to the necessities of air transportation. It is hard to conceive that a statute tending to encourage and assist in the contribution of public improvements by debt-burdened localities should have been intended to stop short merely because the method selected for financing such accommodations to current needs is the issuance of obligations secured by facility revenues, as opposed to the levy of special assessments upon benefited properties.

This is not to say that the benefit of Federal tax exemption, or, stated in reverse, that the burden of a Federal tax upon the interest on obligations issued by states and their subdivisions, is a substantial one; nor that withholding the benefit or imposing the burden could in fact be found to constitute any real and measurable limitation upon their activities within the realm of the test of constitutionality suggested in the *Gerhardt* case. This is a point upon which the parties are at issue as respects the constitutional question, but as to which we refrain from expressing an opinion. We say only that respondent's evidence contains frequent concessions that the issuance of securities subject to Federal taxation might entail some additional cost to the issuer, and hence that some advantage accrues from their exemption.[21] A policy of Congress to confer upon local governments in

---

[18] See. e. g., Revenue Act of 1916, section 8 (e), which refers to "the obligations of a State or any political or taxing subdivision thereof."

[19] See footnote 16, *supra*.

[20] Cf. *James Couzens*, 11 B. T. A. 1040, particularly 1120, 1129.

[21] In his brief respondent recognizes that it "may possibly (with respect to future bond issues) result in depriving the Port Authority of the advantage of paying less than the standard interest rate on its borrowings, an advantage which varies greatly from time to time and which can never be precisely measured."

their issuance of interest-bearing obligations the benefit, however slight, of tax exemption, need, accordingly, in our view, have no limitation to the constitutional immunity, if any, on the one hand, nor to the exercise of the local taxing power on the other.

There remains to be considered the final objection that the Port of New York Authority is not a political subdivision of "a" state but of two states, and hence falls outside the exemption. To this the answer, as we see it, is that the Port Authority is the political subdivision of a state—the State of New York—and also the political subdivision of another state—the State of New Jersey. See *Montgomery B. Case*, *supra*. In its relationship to those states in severalty it lacks none of the attributes which the foregoing definitions prescribe. Within its geographical boundaries it participates in exercising the appropriate sovereign functions of the respective states. And the fact that the area embraced includes a part of each state and hence that the creation of the Port Authority was the proper subject of interstate compact and of approval by Congress can not, we think, be considered as eliminating these attributes. *Leon S. Moisseiff*, *supra*, 525.

If we were considering the constitutional question, the argument could be made that such an interstate body, subject as it is to the approval of Congress, might constitute an exception to any general immunity found to exist in favor of the individual states. But we are not here dealing with the power of Congress to erect as a condition of its consent the relinquishment of a constitutional immunity which would otherwise exist, cf. *Montgomery B. Case*, *supra*, 1247, 1248; but rather with a body whose creation was in that respect unconditionally approved. It might well be that the failure of Congress in conferring that approval to specify the taxability of interest on the Port Authority's obligations is further evidence of an intention that it should be governed by principles applying to political subdivisions generally and receive no different treatment in the field of Federal taxation from similarly organized but entirely intrastate bodies.

This much, at any rate, seems clear: In the area of constitutional problems, a decision that this petitioner is taxable because the interstate authority is peculiarly amenable to Federal control, and hence to Federal taxation, would settle nothing as to the general principle of state immunity. A decision on such narrow grounds, say, by the Supreme Court, would not be susceptible of a characterization similar to that of the Assistant Attorney General as to the *Gerhardt* case that "The opinion seems broad enough to cover all employees of states and municipalities." Hence it could never be suggested that Congress intended the exemption in section 22 (b) (4) to be limited or confined to exclude bistate subdivisions merely to enable the litigation of an otherwise unlitigable constitutional controversy in that narrow field.

And if there is any other reason why there should have been a purpose to discriminate against political subdivisions of two or more states, none has been advanced.[22]

We accordingly take the view that the interest in question is free from tax because it falls within the express exemption contained in the applicable revenue acts. Needless to say, the necessity of discussing the constitutional question being thus eliminated, it will not be further considered. Similarly, any conclusions, whether considered as fact or law, with respect to the weight or ponderability of the burden which the imposition of Federal income taxation upon the interest on local governmental obligations might impose generally or in particular situations, or to the balance of benefit and burden as between Federal and local government, concerning all of which the present record contains several thousand pages of testimony, must, we think, await a proceeding in which the necessity for their formulation is apparent. When and, of course, if, Congress sees fit to remove the protection afforded by the statutory immunity, such an occasion may arise. It can not, in our view, occur sooner.

Reviewed by the Court.

*Decision will be entered for petitioner.*

MURDOCK, *J.*, did not participate in the consideration of or decision in this report.

---

BLACK, *J.*, dissenting: I agree of course that the Port of New York Authority is discharging very important and useful functions for the people of the States of New York and New Jersey and, as for that matter, for the entire nation. However, before the interest on its bonds can be excluded, under the provisions of section 22 (b) (4), from the income of a taxpayer who holds such bonds, it must first be found that the Port of New York Authority is a "political subdivision" of the state. Section 22 (b) (4) exempts from taxation "Interest upon (A) the obligations of a State, Territory, or any political subdivision thereof, or the District of Columbia; * * *."

However important the functions discharged by the Port of New York Authority may be, I do not think it is a "political subdivision"

---

[22] Cf., for example, the situation said to exist in the Chicago region :

"To deal with the various phases of public sanitation, there has been established another series of independent governments in the Chicago Region. The list is long and varied. There are 11 sanitary districts, 190 drainage districts, 1 public health district, and even 4 sovereign mosquito abatement districts * * * . But Lake Michigan is threatened by contamination resulting from the industrial wastes of the Calumet District and the raw untreated sewage of 225,000 people residing in a chain of separate municipalities along the shore of the lake from Michigan City, Indiana, to Kenosha, Wisconsin." [Merriam, Parratt and Lepawsky, "The Government of the Metropolitan Region of Chicago," Univ. of Chicago Press, 1933, p. 53. See also Parratt, "The Governments of the Metropolitan Area of Chicago," Univ. of Chicago Press, 1933.]

of a state, either of New York or New Jersey or both, as that term is used in section 22 (b) (4). I think the Supreme Court decided that question, or at least indicated what the decision should be, in *Helvering* v. *Gerhardt*, 304 U. S. 405, when it said, in discussing article 643, of Treasury Regulations 77: "If the regulation be deemed to embrace the employees of a state-owned corporation such as the Port Authority, it was unauthorized by the statute. But we think it plain that the employees of the Port Authority are not employees of the state or a political subdivision of it within the meaning of the regulation as originally promulgated—an additional reason why the regulation, even before the 1938 amendment, was ineffectual to exempt the salaries here involved."

The majority opinion, by a process of reasoning with which I do not agree, reaches the conclusion that the Supreme Court in the language to which I have referred did not mean to rule that the Port of New York Authority was not a political subdivision of a state. Therefore, says the majority opinion: "In our view the term 'political subdivision' as used in the statute before us must be construed without the benefit of any light from the *Gerhardt* case and only by reference to such conventional aids to statutory construction as are at hand."

As already stated, I do not agree with this view. While the Supreme Court spoke only briefly on the question of "political subdivision," I do not agree that it shed no light on the subject. I not only think the Court did shed light on the subject, I think it spoke directly on the question. Of course what the Court said was with reference to the taxation of salaries of employees of the Port of New York Authority and not with reference to the taxation of interest on its bonds. However, the Court having said, as I view it, that the employees involved in the *Gerhardt* case were not employees of a "political subdivision" of a state, the same line of reasoning, I think, must hold that the bonds issued by the Port of New York Authority were not bonds issued by a "political subdivision" of a state. That seems inevitable to me. For that reason, I dissent from the majority opinion.

SMITH and VAN FOSSAN, *JJ.*, agree with this dissent.

---

MELLOTT, *J.*, dissenting: While it is true that the Court was considering in the *Gernhardt* case the claim of an employee of the Port Authority for immunity from tax under an implied constitutional inhibition, I am not persuaded that the language quoted in the majority opinion here should be given the limited interpretation indicated. Surely it was not dictum. It is equally clear that the

Court did not consider that it was passing upon a question analogous to the one before it in *Brush* v. *Commissioner*, 300 U. S. 352. This, it seems, should dispose of any idea the Court intended to imply that the claim for immunity was being denied because the services were not being "rendered in connection with the exercise of an essential governmental function * * *." Rather it appears that the Court was deliberately setting the stage for the dual conclusion immediately following—that if the regulation "be deemed to embrace the employees of a state-owned corporation such as the Port Authority it was unauthorized by the statute," and "it is plain that employees of the Port Authority are not employees of the state or a political subdivision of it within the meaning of the regulation * * *"

The majority, in spite of the Court's deliberate characterization of the Authority as a "state-owned corporation" and its categorical holding that the employees were not "employees of the state or political subdivision," conclude that it was a "political subdivision." This is based upon the presence of four "sovereign functions"—(1) the power of eminent domain; (2) "certain police powers, including the promulgation and enforcement of regulations for the conduct of navigation and commerce * * *"; (3) maintenance of a uniformed police force; and (4) "the power of subpoena." Before adverting to the sovereign functions which are lacking, let us examine those set out.

The mere fact that a corporation, whether "state-owned" or privately owned, has been given the power of eminent domain falls far short of establishing that it is a "political subdivision." Railway, express, pipe-line, telephone, lighting, power and similar companies are usually given this power. The test uniformly applied in determining whether it may be exercised is "public use"; but the corporation exercising it need not be, nor does it necessarily become, a "political subdivision." The preservation of the health, morals, or safety of the inhabitants of a community, usually referred to as the police powers, is of course an attribute of sovereignty. Apparently the only such power possessed by the Port Authority—in any event the only one mentioned by the majority—is "the promulgation and enforcement of regulations for the conduct of navigation and commerce in the area defined as the Port of New York District." The binding force of these regulations, however, is derived from the concurrence or authorization of the legislatures of the two states, which provide penalties for violation. The power is therefore substantially less than that possessed by an ordinary municipality. The maintenance of a uniformed police force is permitted by the laws of most states, including New York and New Jersey, for protection of private property, e. g., railways, stores, industrial plants, etc., regardless of the fact

that they are owned by private corporations. The members of such a force serve in a dual capacity; but in making arrests and in performing actual police duties they are state officers. The power of subpoena, if actually possessed,[1] is no more than the power frequently given to fact-finding or administrative bodies to direct that witnesses appear or produce documents. The Port Authority, however, does not have the power to pass upon the validity of process or to enforce compliance.

But the attributes and functions of sovereignty withheld from the Port Authority indicate quite clearly that the two states did not intend to create either one or two "political subdivisions." Passing the question of the power of one state to create or participate in creating a political subdivision in the other, let us examine the functions withheld.

The corporation is not politically organized. Its inhabitants had no voice in its creation and have none in its administration. It has no power of legislation and can not enact or enforce ordinances. It has no power to levy or collect taxes. Its funds are not subject to the restrictions generally applicable to state funds, the debts created by it are not state debts within the purview of the provisions of the state constitutions limiting the amount and the power to contract state debts, and it has no power to pledge the credit of either state or to impose any obligation upon either except when such power is expressly granted by statute. The bonds issued by it are a direct and general obligation of the Authority, secured by its general reserve fund and by its covenant "to establish and levy such tolls and charges as may be necessary" to insure sufficient revenue to meet the expenses of operation and to pay principal and interest on the bonds. The bonds are, in effect, "self-liquidating," i. e., payable from tolls, charges, and profits of operation.

Section 22 (b) (4) is a provision granting immunity from tax. As such it should be strictly construed. *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435; *Willcuts* v. *Bunn*, 282 U. S. 216; *Oklahoma Tax Com.* v. *United States*, 319 U. S. 598. I am not convinced that the bonds issued by the "state-owned corporation," whose functions seem to be "limited to those of study, analysis, persuasion, recommendation, and petition on the one hand, and to the acquisition, construction and operation of terminal and transportation facilities on the other,"[2] are exempt from tax under the statute.

Petitioner's claim for immunity from tax under the implied prohibition of the constitution is even more tenuous. *Helvering* v. *Gerhardt*,

---

[1] It is stipulated that there has been no judicial test of the validity of the power to issue subpoenas and orders. Apparently such powers were granted by the Legislature of New York; but the statute never became effective by the concurrence of New Jersey. Since the Authority has only such "additional powers as shall be conferred upon it by the legislature of either state concurred in by the legislature of the other," it is at least debatable whether the power really exists.

[2] Bard, "The Port of New York Authority" op. cit. 15.

*supra; Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466; and *Alabama* v. *King and Boozer*, 314 U. S. 1. In my judgment the deficiency in tax should be sustained.

SMITH and VAN FOSSAN, *JJ.*, agree with this dissent.

-----

DISNEY, *J.*, dissenting: I am unable to concur in the conclusion expressed in the majority opinion and, although I shall not attempt to cover herein all of the considerations impelling this dissent, I wish to set down some thoughts upon the subject. The majority opinion confines itself to consideration of the question whether the Port of New York Authority is a political subdivision of a state; therefore, I shall so limit myself. Several reasons in particular require, in my opinion, that the Port Authority be not considered a political subdivision of a state.

At the outset it is to be noted that, this being a matter of exemption from taxation, the petitioner must bring himself fully within the terms of the statute; and, secondly, that the expression "State, Territory, or any political subdivision thereof" should under primary rules of statutory construction be given its ordinary and usual connotation, Congress being presumed to have given no unusual or extraordinary meaning to the expression. Though there is no lack of variety in the definition of "political subdivision," all cases start out with the idea that the primary and usual sense of the term denotes an actual fraction of the state and its sovereignty, such as a county. 38 Op. Atty. Gen. 563, relied upon by the majority opinion, speaks of "a true governmental subdivision such as a county, township, etc.," thus recognizing the primary and usual connotation of the term—avoidance of which is sought by the petitioner here. Since, however, such entities as reclamation districts have been considered state subdivisions, it is pertinent to inquire further as to the intent of Congress on this matter.

As the majority opinion points out, the statute was initiated in the Revenue Act of 1913, and to that act, therefore, we may well turn for assistance. Indeed, the majority opinion seems to recognize the weight of the original language used in 1913, for it expressly points out the statement of Mr. Cordell Hull, then in the House of Representatives, with reference to the exemption provision. His remarks furnish, however, no definition of political subdivision. The exemption here involved is found in section II B. In section II G, it is also provided "That there shall not be taxed under this section any income derived from any public utility or from the exercise of any essential governmental function accruing to any State * * *, or any political subdivision of a State * * *." It is further provided in substance that if any state or political subdivision of a state had contracted to acquire a public utility, no tax shall be levied upon the income derived

therefrom "so far as the payment thereof will impose a loss or burden upon such State, * * * or a political subdivision of a State." Though these provisions of subsection G concern taxation upon income of the state or political subdivision, and not exemption of interest upon obligations, nevertheless, the fact that such income is to escape taxation only if it is from the exercise of an essential governmental function and will impose a loss or burden upon such political subdivision of a state, is not without significance here; for it seems apparent that the initial idea upon this general subject, as expressed in 1913 by the Congress, was that nothing less than a burden upon a state (or political subdivision thereof) through interference with its essential function should deter the impact of Federal taxation. In case such political subdivision issued interest-bearing bonds, such income would be expended in payment thereof. Therefore, reading the provisions of subsection A and those of subsection G together, I am impressed with the idea that in considering the exemptions of obligations of a state or political subdivision, we should not ignore the fact that in the beginning of the legislation on this subject Congress saw fit to express aptly the constitutional question of connection between essential governmental function and taxes having reference to a state or political subdivision thereof; and it is altogether reasonable and proper to consider that it was the Congressional intent to exclude from considerations of taxation only such obligations or incidents of obligations, of a state or political subdivision thereof, as would lay a detriment upon such state or subdivision within constitutional principles. It seems patent that there is little distinction, if any, in the matter of burden upon the state or political subdivision, between income thereto, and the obligations thereof, or interest thereon, in payment of which such income would be expendable. In either event, the tax would tend to diminish the net return to the state or political subdivision, and if taxation was to be unimpeded, as to the income itself, save by the bar erected by essential governmental function and loss or burden upon the state or political subdivision, logic seems to require that the same considerations were intended to affect the obligations and incidents thereof, such as interest. Such attention on the part of the Congress in the genesis of legislative history on this question, to the constitutional principle of nontaxation of essential governmental activities of a state or political subdivision must be recognized, and the generality of the principle recognized, in any later effort to arrive at the basic intent of Congress, for the reason underlying the exemption of interest upon obligations of state or political subdivision is plainly found in the governmental and constitutional position, or contention of position, of such entity, i. e., upon the right, or at least claim of right, to be free from burden of tax by the central government. No other reason appears for a distinction between such civic organism as state or sub-

division, and ordinary bodies corporate, the interest upon the obligations of which was taxed.

Prior to 1913 the Supreme Court had held that the basis of exemption of state agencies and instrumentalities was the "strictly governmental character," *South Carolina* v. *United States* (1905, 199 U. S. 437, 461, or essential governmental function. *Flint* v. *Stone Tracy Co.* (1911), 220 U. S. 108, 172. In 1913 Congress legislated in the light of such decisions and used, in essence, their words on the subject. It plainly recognized the limits upon taxation of the states, and the limits of state immunity. In my opinion, it was with such limits in mind that Congress acted, and, in exempting interest on state or subdivision obligations, it appears to have intended to exempt interest only so far as it adversely affected such state or subdivision, i. e., only in the exercise of such essential governmental functions, and therefore, did not intend to include in the concept of state subdivision an entity not carrying on essential governmental functions. With that criterion so explicitly set out in subsection G, it seems implicit in subsection B. I realize that it rests upon implication, but so does the entire doctrine of exemption of the instrumentalities of state and of general government, from taxation by the other. *South Carolina* v. *United States, supra,* p. 453.

In the constitution of the State of New York also convincing evidence is found that that state does not consider the Port of New York Authority as a political subdivision thereof. Article 10, § 5, has to do with "Public corporations; restrictions on creation and powers; accounts; obligations of." The section was added by the Constitutional Convention of 1938. After referring to public corporations and indebtedness and powers, it is pointed out that "this paragraph shall not apply to a corporation created pursuant to an interstate compact." Then, with reference to supervision by state or city comptroller, it is provided that such provision "shall not apply to such public corporation created pursuant to agreement or compact with another state * * * except with the consent of the parties to such agreement or compact." Then follows the highly significant expression, "Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof." All this indicates a clear distinction between a political subdivision of the state and a public corporation, including one created by compact with another state. If not, then in order to guard against liability of the state or any political subdivision for the payment of obligations issued by the Port Authority, it would have been necessary to insert some such expression as "Neither the state nor any political sub-

division thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, *or by any other political subdivision* of the state"; for if the Port of New York Authority is a political subdivision and not a public corporation, the language of the constitution as written above does not prevent assumption of its obligations by the state or any political subdivision thereof. Yet, the object of the constitution to prevent just such contingency is crystal clear. This constitutional provision shows well that the Port of New York Authority or any organization to the same effect is, within the intendment of the constitution of New York, merely a public corporation and not a political subdivision of the state—and in *Helvering* v. *Gerhardt*, 304 U. S. 405, it is stated: "The Port Authority is a bi-state corporation, * * *"; again, "a state-owned corporation such as the Port Authority."

The same effect is found in *City of New York* v. *Wilcox*, 189 N. Y. S. 724. The case involved an injunction sought by the city of New York against the setting up of the Port of New York Authority, upon the ground, among others, that the proposed compact sought to create an unauthorized quasi-political subdivision of the United States. The court does not narrow its discussion to a political subdivision of the United States, but says:

> The contention that the legislative act herein creates a new political subdivision is also without merit. It is obvious that the outlining of a district for the purpose of applying therein certain rules and regulations under which the citizens of the whole state and of an adjoining state will reap an unqualified and direct benefit is not the creation of a political subdivision. No power to tax is granted, no governmental authority is bestowed, and, as pointed out above, the powers of existing municipalities over their properties and their sinking funds and their power to develop port and harbor facilities are expressly preserved. The sole power granted to the joint board of managers, which power is not to be exercised until the states have agreed upon a comprehensive plan, is to do only what any private corporation may do, namely, to own and operate terminal and transportation facilities, and to operate them not for private gain, but for the welfare and progress of the community.

The courts of New Jersey seem to agree with the general principles laid down by the New York Court, for in *Lydecker* v. *Township of Englewood*, 41 N. J. L. 154, a political subdivision appears to be tested by territory, organization of its inhabitants, the exercise of governmental functions, and the exercise by the electors therein of some powers of local government. Again, in *Van Cleve* v. *Passaic Valley Sewerage Commissioners*, 71 N. J. L. 574; 60 Atl. 214, the test applied was that of functions of local self-government. Such tests, it seems to me, the Port of New York Authority very obviously can not meet.

In considering whether Congress in 1913, when it first used the language here involved, intended to include such entities as the Port

of New York Authority, it seems altogether helpful to remember that at that time, as I understand the record in this case, such organization was new thought, if not actually unknown, at least in the United States. Congress can hardly be presumed to have intended to describe or include, therefore, such organization, unless it plainly so signified. It was obviously not within the ordinary and usual concept at that time of the expression "political subdivision of a state." To believe that the expression then used was intended to include such an anomalous corporate body as one resulting from a completely novel compact between two states and including some 200 ordinary municipalities or political subdivisions, seems to me impossible. The language has been continued throughout later revenue acts, yet the fact remains that it was set up in 1913, has remained unchanged since that time, and must take its primary significance from Congressional intendment at that time. The opinions of the Attorney General quoted by the majority opinion were rendered with reference merely to special assessment improvement districts, and, except for reference to the term "political subdivision" as "broad and comprehensive," seem to offer little aid on the peculiar problem here. I can not agree that they offer reason for varying the usual rule of statutory interpretation that legislatures must be presumed to have used language with its usual significance. The first opinion relies most heavily upon the power of taxation given the special assessment district—and denied to the Port Authority. The legislative history in this matter is not convincing.

The conclusion of the majority can find no basis in a general subdivision of state governmental power. It is clear that the Port Authority is not of the same category as a county. city, town, or municipality, with a fraction of general sovereign power. The conclusion, therefore, that the Port Authority is a political subdivision rests perforce upon an enumeration of some powers which, it is contended, are governmental in nature and are sufficient to uphold the definition of "political subdivision of a state." Far from comprising the greater part or even a substantial portion of the totality of state governmental power, those enumerated and relied upon seem scanty indeed. They are: the power of eminent domain, the exercise of certain police power, the power to issue subpoenas, and certain regulatory powers.

It should, of course, be noted at the outset, from this point, that an enumeration of powers delegated by state is not of itself sufficient even to indicate the creation of a political subdivision. If that were true, then every corporate agency of a state would be a political subdivision. In order to classify the Port Authority as a political subdivision, we must find it exercising powers which take it out of the class of mere state instrumentality. Upon examination of the only powers relied upon in the majority opinion, I find none that indicates

anything more than mere state instrument. The power of eminent domain, first, is variously delegated by different states. In particular, it is usually delegated to railroads and public utilities. Eminent domain is eliminated as evidencing political subdivision. The police powers relied upon are also, in my opinion, insufficient to so demonstrate. The assistance rendered by a state to various organizations, through a police force, is well known and it seems to me that unless the police officers can not be considered as officers of the state, utilized by state instrumentalities, their existence is not indicative of political subdivision. The state did not surrender police power to the Port Authority, but the state exercised it through Port Authority personnel as officers of the state. They are "designated by statute as regular peace and police officers of both states * * *." *Montgomery B. Case*, 34 B. T. A. 1229, 1235. The power to issue subpoenas has in fact, as I read this record, not been granted. The State of New Jersey never concurred in the statute passed on that subject by New York, with the intent to amend the "Comprehensive Plan." The majority opinion merely says that "The laws of New York purport to grant the Authority the power of subpoena." Since power must be mutually granted by both states. apparently this element is not relied upon as basis of decision. So far as concerns regulations, it appears that they derived their sanction from the state legislatures themselves and do not constitute, therefore, a delegated power.

With the power of taxation specifically denied, the Port of New York Authority appears no more than a mere legal instrumentality. Indeed, as the majority opinion recites, it is stipulated, that the Port of New York Authority "is a body politic and corporate, the joint agency of the States of New York and New Jersey * * *." In my opinion, it is just that, and no more, and to class as nontaxable the interest upon its obligations would require freedom from taxation of such interest as to state instrumentalities in general. That the whole matter of the Port Authority is "public," does not answer the question. Any state agency seems public in its nature. In my concept of a political subdivision, there is an element of home rule. It exists in reclamation districts or drainage districts where the burdens, either by taxation or assessments against property, are voted by the parties affected, and that seems to be the reason underlying classification of such entities as political subdivisions. Such element, however, is lacking in the present instance.

There remains for consideration the fact that the alleged "political subdivision of a state" has reference to two states. The point is not inconsequential. To analyze the constitutional aspects of a political subdivision of two states, a sort of fusion of separate sovereign state powers, is beyond the scope of this dissent. Only the logical and consti-

tutional impossibility is suggested. The Port Authority is such fusion, or it is nothing but a compact. As the majority opinion states, the actions of the commissioners of the board are binding only after approval by a majority from each state and the governor of each state has a veto power over the acts of the commissioners from his state. He apppears to have none over the commissioners from the other state. Logic forbids that such entity be regarded as a political subdivision of a state. The government of the Port depends not upon the electors or officers of one state, but upon them and those of another state, acting conjointly and mutually. It is truly a compact. New York can not be subdivided into something which is in part New Jersey. The organization is *sui generis* in governmental principles; beyond the idea of political subdivision of a state. It involves property and territory beyond the borders of each state, which, to say the least, is something beyond the usual significance of the term involved. This extraordinary organism is seen to be merely the "bi-state corporation created by compact between New York and New Jersey," which *Helvering* v. *Gerhardt, supra,* denominates it. The concept of political subdivision of a state appears to me too foreign to the nature of the Port Authority to permit classification therein. In my view, too, as more fully expressed by my brothers Black and Mellott, *Helvering* v. *Gerhardt, supra,* holds contrary to the majority opinion here. I would deny the exemption, and therefore respectfully dissent.