ESTATE OF CAROLINE WHITE, DECEASED, WALDRON KINTZING POST, JOHN ROSS DELAFIELD AND BACHE McE. WHITLOCK, AS EXECUTORS OF THE WILL OF CAROLINE WHITE, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 108930. Promulgated January 28, 1944.

*Lewis L. Delafield, Jr., Esq.*, for the petitioners.
*Mason B. Leming, Esq.*, for the respondent.

OPINION.

OPPER, *Judge*: This is a proceeding to redetermine deficiencies in income tax for the years 1938 and 1939 in the sums of $2,446.79 and $2,164.58, respectively. Petitioners concede the correctness of the deficiencies to the extent of $138.20 for 1938 and to the extent of $169.06

for 1939. The controverted deficiencies rest on the failure to include in her returns for the years in question interest received by petitioners' decedent on bonds issued by the Triborough Bridge Authority.

The parties have submitted a stipulation of facts and other pertinent facts stand admitted by the pleadings, all of which we hereby find accordingly.

As early as 1916 the Department of Plant and Structures of New York City formulated plans for bridge connections between three of the city's boroughs—Manhattan, the Bronx, and Queens. Between 1925 and 1932 various steps were taken toward this end. Engineering plans were commenced and borings and surveys made. A triborough bridge connecting Manhattan, the Bronx, and Queens was authorized as a toll bridge to be operated by the City Bureau of Plant and Structures in 1929.[1] The city, through the Department of Plant and Structures, let contracts for the construction of certain piers and anchorages costing roughly $2,365,000, construction of which was completed by 1932. The undertaking was financed by the sale of tax anticipation notes and long term corporate stock authorized by the charter of the city.[2] Due to the financial condition of the city, work on the Triborough Bridge was suspended in May 1932.

The Triborough Bridge Authority was organized pursuant to chapter 145 of the Laws of New York State of 1933, which became effective April 7, 1933.

From the time of its organization and at all times thereafter the power of the Authority was vested in a majority of the members of a three-man board appointed by the mayor of New York City. The members of the board were subject to removal by the mayor for inefficiency, neglect of duty, or misconduct in office. In carrying on its activities it used various facilities and employees of the city, paying a portion of the cost or compensation. Except in special instances it availed itself of the services of the city corporation counsel for legal advice. Its agents and employees were subject to the provisions of the Civil Service Law of New York State. Its moneys were paid, pursuant to the organic law, to the comptroller of the city as its agent and were paid out by him on requisition of the authorized agent of the Authority after audit by the comptroller. The comptroller was required to deposit the funds in a special bank account and not commingle them with other funds. He was authorized to require security for the accounts and from time to time to examine the books of the Authority and any other matters relating to its financial standing. The Authority had

---

[1] 1929 New York Local Laws, amended page 77 by Local Law No. 8 of that year, 1929 Local Laws, p. 84.

[2] The charter of the city prohibited issue of such stock except for revenue-producing improvements. (City Charter, New York Laws of 1901, ch. 466, amended by Laws of 1916, ch. 615.)

the power of eminent domain, but in the name of the city of New York. Except for transfer and estate tax, its bonds and the interest thereon were not subject to state, municipal, or local tax in New York. It was a continuation, as to matters within its jurisdiction, of the Department of Plant and Structures of the city for the purpose of succession to all such of the rights, powers, duties, and obligations of the city and department as related to the designing and construction of the Triborough Bridge. Title to all real property operated by it stood in the name of the city of New York.

Pursuant to the statute creating the Authority the city of New York assigned to the Authority without consideration some of the land used for its bridges and the approaches to them, the city retaining title. Other land similarly used was purchased by the Authority, or the city and the Authority jointly, but title was always taken and retained in the name of the city. When all liabilities incurred by the Authority have been met and all its bonds paid in full, all rights and properties of the Authority pass to and become vested in the city.

From the time of its organization to the end of 1939 the only operations in which the Authority had been engaged had been the Triborough Bridge and the Bronx-Whitestone Bridge. Its only revenues had been derived from tolls collected on the bridges and certain interest on deposits and protection funds. Subsequently, it acquired jurisdiction over the Marine Parkway and the Henry Hudson Bridge.

The three members of the Authority, appointed by the mayor of New York City, took office in April 1933. The engineering office of the Bureau of Plant and Structures engaged in work on the Triborough Bridge and all records relating to it were transferred to the Authority. These employees did not lose their civil service status. In the same year the Authority applied to the Federal Emergency Administration of Public Works for a loan and grant to finance construction of the Triborough Bridge.

The requests were approved and a grant of $9,200,000 and a loan of $35,000,000 was made to the Authority. As part of the loan agreement the Federal Government purchased $35,000,000 of the Authority's bonds issued under chapter 145 of the Laws of 1933 of the State of New York, creating the Authority, and pursuant to a resolution adopted by the Authority. None of these bonds were approved by the electors of the State of New York at an election, and the comptroller of the city has never included them in statements of the indebtedness of the city.

Under the authorization of the same statute and pursuant to a resolution of the Authority adopted April 23, 1937, a new $53,000,000 issue of Triborough Bridge Authority bonds was sold to refund the $35,-000,000 issue of 1933 and to finance another bridge. These bonds were direct and general obligations of the Authority. The Authority had

no revenues from which to pay the bonds except the revenues from the Triborough and the Bronx-Whitestone bridges. These revenues, less amounts to be withheld for operating expenses, were pledged to secure the payment of the principal, including sinking fund, and interest payments on the bonds. The State of New York agreed with the bondholders that the state would not limit or alter the right vested in the Authority to establish and collect tolls necessary to produce sufficient revenue to fulfill the terms of the bonds nor in any way impair the right of the bondholders until the obligations were fully discharged. The state also agreed that it would authorize no other vehicular connection in competition with the Authority's projects. Bonds of this 1937 issue were held by petitioners' decedent in 1938 and 1939. It is interest on these bonds which respondent claims constituted taxable income in those years.

This is a companion case to *Estate of Alexander J. Shamberg*, 3 T. C. 131, decided herewith. Whatever differences may exist in the factual background between the two cases are, we think, irrelevant to the underlying principle.

In the complex and varying context of local government a complete identity of detail among political subdivisions is not to be expected. It is consequently unnecessary in our view that the organization and characteristics of the Triborough Bridge Authority should be identical in all respects with those of the New York Port Authority in order for the principles applicable in the one case to be determinative of the other. There seems little purpose in reviewing the minutiae of the plan and operation of the two Authorities. In some respects they are identical or similar. In others, the dissimilarity is more favorable to the respondent's position, in still others less, than the facts in the *Shamberg* case. But, since no one factor is conclusive, we look to the situation as a whole for guidance, and for that purpose we need not attempt to improve upon respondent's own expression that "While Triborough is not entirely like the Port of New York Authority, it is a very similar type of agency." Suffice it to say that the public character of the Triborough Bridge Authority, its authorization and control by the people of New York directly through the state government and indirectly by the authorized action of the city of New York, and the purposes and performance of its functions are such that in our opinion it is a political subdivision of that state. with the consequence that interest on its obligations is expressly exempted by Revenue Act of 1938 and Internal Revenue Code. section 22 (b) (4), and that we come to that conclusion for the reasons and on the authorities set forth at length in *Estate of Alexander J. Shamberg, supra.*

In addition. however, the existence of these relationships between the Authority, its responsible officials. and its obligations, on the one hand, and the State of New York and its political subdivision, the

city, on the other, are such as to bring into play the closely parallel doctrine that such obligations are themselves the obligations of the city for purposes of the statutory exemption. *Commissioner* v. *Pontarelli* (C. C. A., 7th Cir.), 97 Fed. (2d) 793; *Commissioner* v. *Carey-Reed Co.* (C. C. A., 6th Cir.), 101 Fed. (2d) 602; *Bryant* v. *Commissioner* (C. C. A., 9th Cir.), 111 Fed. (2d) 9; *Riverview State Bank*, 1 T. C. 1147. Notwithstanding the ambiguity of numerous administrative expressions,[3] this is a principle which deals with the statutory exemption equally with the constitutional question. Cf. G. C. M. 13469. XIII-2 C. B. 125.

Most of the aspects to which resort would be had for the purpose of discerning the public character of the Authority demonstrate with equal clarity that the obligation of the city and the state, while not a direct liability for payment, consists, as in the *Bryant* case, for example. of collateral duties involving creation, collection, safekeeping, supervision, and disbursement of the means of payment.' This appears with particular force upon consideration of the functions of the mayor and comptroller in their respective responsibility for the personnel of the governing board and its funds and accounts, as well as from the use of city property in its operations.

Against a background of this sort problems and difficulties inherent in an attempt to draw sharp lines of delineation between the two grounds of decision become manifest. But since the same result follows from either approach, the necessity of attempting to do so is not apparent, particularly since they are not of a mutually exclusive character.[4] On the contrary, this would appear to be a subject concerning which the formulation of complicated and technical legal rules and the drawing of hairbreadth distinctions seems peculiarly out of place. The public as a whole is concerned with all aspects of governmental financing. If the basic legislation can be found to permit. the rules governing its various phases, including the impact of the Federal income tax upon the interest which it bears, should be without avoidable uncertainties and obscure distinctions. As the entire fabric of the statutory exemption demonstrates, see *Estate of Alexander J. Shamberg*, *supra*, it not only permits but compels that broad and untechnical application. And we think it hard to discover the principle which requires that a special tax bill, collectible solely

---

[3] E. g., II-2 C. B., 90 (1923) (Michigan State Fair) ; letter, Commissioner Guy T. Helvering, to Commissioner Robert Moses, dated Feb 17, 1937, 383 C. C. H. 8164 (Triborough Bridge) ; letter (1937) to Hawkins, Delafield & Longfellow, Nehemkis "The Public Authority." 47 Yale Law Journal 14. 27. (Marine Parkway)

[4] For example, a special assessment district which respondent would concede to be a political subdivision under the statute might employ funds obtained by the issuance of obligations of another political subdivision, such as a county or municipality. Cf. Williams and Nehemkis. "Municipal Improvements as Affected by Constitutional Debt Limitations," 37 Col. Law Rev. 177, 204, and see *Milo W. Bekins, et al., Executors*, 38 B. T. A. 604, particularly 613–615.

out of a single property, *Riverview State Bank, supra,* will carry interest exempt from Federal tax, while comparable obligations representing investment in a great municipal public work like the Triborough Bridge, but collectible out of tolls accruing from its use, would not.

We are not called upon to say here that every debt created for or secured by public improvements or constituting an obligation of a public instrumentality is necessarily included in the statutory interest exemption. But for purposes of the present proceeding we conclude that such distinctions as exist between these facts and those appearing either in the *Shamberg* case or in *Riverview State Bank* and its related cases are not of such fundamental proportions as to warrant a contrary conclusion, and that the obligations of the Triborough Bridge Authority thus participate in the statutory immunity in two slightly different but closely related ways. Petitioners' position is sustained.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

———

MURDOCK, *J.*, did not participate in the consideration of or decision in this report.

———

BLACK, MELLOTT, and DISNEY, *JJ.*, dissent on the same grounds as stated in their respective dissenting opinions in *Estate of Alexander J. Shamberg*, 3 T. C. 131, this day decided.

———

SMITH and VAN FOSSAN, *JJ.*, dissent as indicated by their agreements with the respective dissenting opinions above.