AMERICAN BUSINESS SERVICE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 33003-86.          Filed October 3, 1989.

*Richard W. Craigo,* for the petitioner.
*Sherri Spradley Hinnant,* for the respondent.

## OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in petitioner's 1980 and 1981 Federal income tax in the amounts of $3,680 and $12,696, respectively. The deficiencies for both years resulted from the disallowance of expense deductions taken by petitioner for the rental of a 53-foot powerboat known as the *Americana.* The case was submitted on the basis of a stipulation of facts.

During the years at issue, petitioner was a California corporation with a principal place of business in Newport Beach, California, and approximately 25 branch offices located primarily in central and southern California. At the time of the filing of the petition herein, its principal place of business was Costa Mesa, California. Petitioner's principal business at all relevant times was providing, for a fee, the temporary services of clerical and industrial workers, to its business customers.

In 1980 and 1981, petitioner employed at its offices a staff of between 80 and 128 full-time employees (permanent staff) who were responsible for placing its approximately 13,000 clerical and industrial workers (temporary service personnel) with petitioner's business customers. Petitioner maintained for its employees, both permanent and temporary, a profit-sharing plan which qualified as such under the Internal Revenue Code. One requirement for participation in such plan was that the employees work 1,000 hours during a plan year (an average of approximately 20 hours per week). All employees who met this and other specified requirements became participants in the plan, as required by law.

No space at any of petitioner's offices was assigned to the temporary workers. They were normally not required to come to petitioner's premises and were ordinarily sent to a customer by phone call from a branch office. The great majority of the temporary personnel worked less than 40 hours per week on assignments by petitioner. Some of them were also employees of other companies in the business of supplying temporary personnel. The temporary personnel rarely had reason to go to the branch offices, but they were welcome there. The payroll checks issued by petitioner to the temporary workers were usually mailed to them at addresses designated by them, although some of them picked up their checks in person at the branch offices.

During its 1980 taxable year, petitioner chartered the *Americana* for a consideration of $1,000 per excursion on eight separate occasions for the stated primary purpose of providing recreation for its employees. During the 1981 taxable year, it chartered the boat 41 times. The parties have stipulated that the $1,000 fee for each such charter was fair and reasonable.

The *Americana* could safely and comfortably accommodate approximately 25-35 persons, plus the crew. The executive committee of the corporation authorized the charters as part of its perceived responsibility to provide entertainment and recreation for corporate employees. Because of the location of the central office away from the branch offices, the executive committee was concerned about the lack of desirable social interaction between its

employees, and authorized the charters as a method of promoting interaction among its branch employees and its central office employees, including its managerial and executive employees.

After a charter was authorized by the executive committee, the planning responsibility was delegated to a central office employee (the administrative assistant) including the determination of availability of the *Americana* (since it was subject to prior charters) and the necessary coordination with the central office and branch offices. Once the availability of the boat was established, a notice stating the date of the cruise was sent to all branch offices to be posted in each such office. The notice has been treated as inviting participation of employees and their guests. After viewing the posted "invitation," those desiring to request participation would then directly communicate with the administrative assistant by telephone. A roster of persons to attend would be compiled and maintained by the administrative assistant. Since there was obviously a limit to the number of persons which each charter could accommodate, requests were accepted by the administrative assistant on a "first-come, first-served" basis. After reservations were made, the administrative assistant would, shortly before each charter, confirm each reservation by telephone to the particular employee.

At no time were any employees of petitioner, either permanent staff or temporary personnel, ever expressly excluded from participation in any charter. Other than posting the notices in branch offices, no other type of communication to employees of the availability of the charters was made and no telephone calls or mailings were made to the approximately 13,000 temporary employees. Accordingly, in practice very few of those temporary personnel knew of the cruises since very few of them ever came to the branch offices, namely, only those who did so to receive their paychecks in person.

Over 800 persons attended the 49 cruises in issue. Of these, only three were temporary personnel (two of whom were relatives of permanent employees). The parties have stipulated that "Fewer than one-half of the remaining attendees were owners, officers, directors, highly compen-

sated employees, family members of the same and guests of the same ('restricted persons'), and more than one-half of such remaining attendees were permanent staff employees, and their guests, other than restricted persons."

Petitioner claimed employee recreational expense deductions under sections 162 and 274(e)(5)[1] (now section 274(e)(4)[2] for amounts paid for the charters during the taxable years 1980 and 1981 in the respective amounts of $8,000 and $41,000. These deductions were disallowed by the Commissioner. The sole issue is the deductibility of these charter fees under sections 162 and 274.

It is a matter of hornbook law that deductions are a matter of legislative grace, and that a taxpayer seeking a deduction not only must "point to" an applicable statutory provision, but must also bear the burden of proof to establish that he comes within its terms. It is undisputed that the charter fees in 1980 and 1981 were ordinary and necessary expenses proximately related to petitioner's trade or business. However, petitioner must prove further that the deductions, otherwise available to it under section 162, are not forbidden by the restrictions in section 274.

*Section 274.* Section 274, added to the Code by section 4(a)(1) of Pub. L. 87-834, Revenue Act of 1962, 76 Stat. 974, is "a disallowance provision exclusively"[3] which significantly narrows the class of entertainment expenses deductible under section 162. Section 274(a)(1) reads as follows:

SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.

(a) ENTERTAINMENT, AMUSEMENT, OR RECREATION.—

(1) IN GENERAL.—No deduction otherwise allowable under this chapter shall be allowed for any item—

(A) ACTIVITY.—With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years.

[2] Sec. 274(e)(5) was amended and redesignated sec. 274(e)(4) by sec. 1114(b)(6) of Pub. L. 99-514, 100 Stat. 2085, 2451, the Tax Reform Act of 1986, effective for taxable years beginning after Dec. 31, 1986.

[3] H. Rept. 1447 at 428, 87th Cong., 2d Sess. at 428 (1962), 1962-3 C.B. 405, 423; S. Rept. 1881, 87th Cong. 2d Sess. at 169 (1962), 1962-3 C.B. 707, 731. Cf. *Sanford v. Commissioner,* 50 T.C. 823, 826 (1968), affd. per curiam 412 F. 2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969).

substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or

(B) FACILITY.—With respect to a facility used in connection with an activity referred to in subparagraph (A).

In the case of an item described in subparagraph (A), the deduction shall in no event exceed the portion of such item which meets the requirements of subparagraph (A).

The parties have stipulated that "The Executive Committee of the corporation authorized such charters as part of its perceived responsibility to provide entertainment and recreation for corporate employees." Petitioner does not challenge the applicability of section 274(a)(1)(B) to bar the contested deduction, unless the expenses fall within one of the exceptions to section 274(a) set forth in section 274(e). And it relies upon the exception of section 274(e)(5), which provides:

SEC. 274(e). SPECIFIC EXCEPTIONS TO APPLICATION OF SUBSECTION (a).—Subsection (a) shall not apply to—

\*    \*    \*    \*    \*    \*    \*

(5) RECREATIONAL, ETC., EXPENSES FOR EMPLOYEES.—Expenses for recreational, social, or similar activities (including facilities therefor) *primarily for the benefit of employees* (other than employees who are officers, shareholders or other owners, or highly compensated employees). For purposes of this paragraph, an individual owning less than a 10-percent interest in the taxpayer's trade or business shall not be considered a shareholder or other owner, and for such purposes an individual shall be treated as owning any interest owned by a member of his family (within the meaning of section 267(c)(4)). [Emphasis added.]

The Government contends that the section 274(e)(5) exception to the disallowance of recreational expenses[4] for employees is not applicable here. Its position in substance is that the temporary personnel were "employees" within the meaning of section 274(e)(5), and that the cruises were so structured as to discriminate against them by in effect excluding them from participation in those recreational events. We hold, first, that such personnel were "employees" within the meaning of the statute; second, that although they were never expressly excluded from any

---

[4]For convenience, we will use the term "recreational expenses" as a shorthand expression for the statutory "expenses for recreational, social, or similar activities."

cruise, petitioner discriminated against them by in fact substantially preventing them from taking advantage of such recreational facilities made available to its other employees; but, third, that petitioner could nevertheless properly limit the availability of the cruises to its office employees in the circumstances of this case without losing the benefits of the section 274(e)(5) exception to the otherwise admittedly applicable disallowance provisions of section 274(a)(1).

1. *Whether the temporary personnel were "employees."* The section 274(e)(5) exception to the section 274(a)(1) disallowance of "entertainment, amusement, or recreation" expenses is available only if such activities are "primarily for the benefit of employees (other than employees who are officers, shareholders or other owners, or highly compensated employees)."

Petitioner had the ultimate control of determining whether a worker would be given an assignment, or to whom such assignment might be made. It received a fee from its customers, but the worker's relationship to petitioner continued. The temporary workers remained petitioner's employees even though they were supervised by the customers when working on an assignment. Petitioner, not the customers, paid the workers their wages or salaries, reported the payments to the IRS, and issued the familiar W-2 Forms to the workers to be used by them on their own income tax returns, both Federal and State (if applicable). There is nothing in the record to suggest that the customers even knew what salaries or wages were paid to these employees. Petitioner's income tax returns indicate that it paid workers' compensation and payroll taxes relating to its temporary employees. It also maintained a profit-sharing plan for all its personnel who worked a minimum of 20 hours a week, both permanent and temporary workers.

In connection with the profit-sharing plan, we note that section 401(a) of the Code refers to a "profit-sharing plan of an employer for the exclusive benefit of his *employees*" (emphasis supplied), and that section 404 provides for deductions in respect of contributions by an employer relating to a profit-sharing plan. And we note further that the parties have stipulated that the profit-sharing plan

"maintained [by petitioner] for it employees * * * qualified as such under the Internal Revenue Code." Accordingly, it would seem that petitioner became entitled to deductions with respect to its contributions to the plan, as they related not only to its permanent personnel but also to its temporary workers who served the required minimum of 20 hours a week. Petitioner's returns in evidence show that certain amounts were in fact claimed as deductions for "Pension, profit-sharing, etc. plans," and we cannot assume, in the absence of evidence to the contrary, that these amounts did not include payments relating to temporary employees. Notwithstanding that identical words appearing in different contexts of the same revenue measure may be used with different meanings depending upon the objective that Congress seeks to achieve, *Helvering v. Stockholms &c. Bank,* 293 U.S. 84, 86-88 (1934), we can find no indication here that Congress intended the word "employee" to have a meaning in section 274(e)(5) different from that in sections 401 and 404. If the temporary workers can qualify as "employees" under sections 401 and 404, they can surely qualify as such under section 274(e)(5). We reject petitioner's argument that its temporary personnel were employees only in a "technical sense." They were its employees within the meaning of the statute.

2. *Discriminatory character of the cruises.* Petitioner admits on brief that "As a practical matter, the charters primarily benefited the permanent staff." However, it contends there were "no restrictions or prohibitions on acceptance" by the temporary personnel. Indeed, the stipulation of the parties states that "At no time were any employees * * * , either permanent staff or temporary service personnel, ever expressly excluded from participation in any charter." But that is not the point. The temporary employees were prevented from participation in the cruises by means other than an express exclusion. We find that petitioner in fact excluded them by structuring the program in such manner as to make it highly unlikely that temporary employees would ever learn in time, if at all, that there was an invitation that they could theoretically accept.

The cruises sponsored by petitioner in 1980 and 1981 were arranged by a staff employee (the administrative

assistant) in the central office. A schedule of cruises was sent to all branch offices to be posted therein. A sample cruise schedule is in evidence as an exhibit to the stipulation of facts. This schedule, dated October 23, 1980, is on a single page, and lists the time and date for each of nine cruises. The first cruise was scheduled for November 22, 1980, and the last for December 23, 1980. In order to go on a cruise, an employee was required to phone the administrative assistant in the central office and make a reservation. Requests were accepted on a "first-come, first-served" basis. The parties have agreed that although there was no "express" exclusion of the temporary employees, in practice very few of them even knew of the cruises. The temporary workers rarely visited the central or branch offices where the schedules were posted. They received their assignments by telephone and the salary checks were mailed to all but the very few who picked them up in person. No attempt was made to inform them of the cruises by phone or in any other manner.

During the time period at issue, over 800 persons participated in the 49 cruises sponsored by petitioner. Of those 800, only 3 were temporary employees and 2 of the 3 were relatives of the permanent staff. The latter were obviously aware of the posted schedule in their offices and could well have informed their kin about the opportunity to go on the cruise. Petitioner has not shown otherwise.

The intent to exclude the temporary personnel from these cruises is clear. Further, although the temporary employees received their assignments by telephone, the record fails to show that any attempt was made to use that opportunity to inform them of the practice of posting the schedules. Similarly, no attempt was made at the time the paychecks were mailed to the temporary employees to inform them of the dates of any scheduled cruises or of the opportunity to participate in them. Petitioner claims that giving notice would have been impractical. The only cruise schedule in evidence shows that it was prepared in final form more than a month in advance of the cruises listed. We think that it would hardly have been impractical to include the one-page notice of the scheduled cruises in the same envelope along with the paychecks mailed to the employees or to inform

them of the posted schedule when the telephone assignments were made.

Certainly, unless such employees were meant to be excluded as a practical matter, they should have been given an equal and timely opportunity to request participation therein. The nearly nonexistent participation by the temporary employees was foreseeable and was plainly the result of thinly disguised planned discrimination. The suggestion that the cruises were equally available to all employees to accept on a first-come, first-served basis calls to mind the poignant ironical words of Anatole France about "the majestic egalitarianism of the law, which forbids rich and poor alike to sleep under bridges, to beg in the streets, and to steal bread."[5]

3. *Whether the discrimination between the two groups of petitioner's employees makes the section 274(e)(5) exception inapplicable.* The section 274(e)(5) exception applies only where the recreational activities are "primarily for the benefit of employees" other than the restricted group. The question here is whether the phrase "primarily for the benefit of employees" inherently embodies the thought that the recreational activities under consideration must be equally available to all the employees, temporary as well as permanent, without discrimination. The naked words themselves could be read either way, and the matter obviously calls for further probing.

When the bill which became the Revenue Act of 1962 was before the Congress, the report of the House Ways and Means Committee, H. Rept. 1447, 87th Cong., 2d Sess. (1962), stated at A34-A35:

> Paragraph (5) provides an exception for expenses for recreational, social, or similar activities which are primarily for the benefit of the employees of the taxpayer. This exception applies to the usual employee fringe benefit programs. For example, the expenses of operating a company bowling alley or swimming pool which is available to all employees *generally* will be deductible. * * * [Emphasis supplied.]

Substantially identical language appeared in the report of the Senate Finance Committee, S. Rept. 1881, 87th Cong.,

---

[5]Anatole France, Le Lys Rouge (1894), ch. 7: "La majestueuse égalité des lois, qui interdit au riche comme au pauvre de coucher sous les ponts, de mendier dans les rues et de voler du pain."

2d Sess. at 176 (1962). We note at once that the absence of a comma immediately before the word "generally" results in an ambiguity. Thus, "generally" could be read to refer to "employees," and it could equally be read as referring to the clause "will be deductible." However, that ambiguity has been resolved by section 1.274-2(f)(2)(v), Income Tax Regs., which provides:

(v) *Recreational expenses for employees generally.* Any expenditure by a taxpayer for a recreational, social, or similar activity (or for use of a facility in connection therewith), primarily for the benefit of his *employees generally,* is not subject to the limitations on allowability of deductions provided for in paragraphs (a) through (e) of this section. * * * Ordinarily, this exception applies to usual employee benefit programs such as expenses of a taxpayer (a) in holding Christmas parties, annual picnics, or summer outings, for his *employees generally,* or (b) of maintaining a swimming pool, baseball diamond, bowling alley, or golf course available to his *employees generally.* Any expenditure for an activity which is made under circumstances which discriminate in favor of employees who are officers, shareholders or other owners, or highly compensated employees shall not be considered made primarily for the benefit of *employees generally.* * * * [Emphasis supplied.]

What then is the meaning of the term "employees generally"? Does it mean *all* employees without exception? A moment's reflection convinces us that Congress could not have intended to impose any such rigid requirement. For example, take the case of a large corporation with manufacturing plants and offices in many of the large cities throughout the United States. Suppose that it provides a swimming pool for its employees in a city in the Deep South which is characterized by hot and uncomfortable weather. In order to avoid running afoul of the requirement of section 274(e)(5) that the pool be "primarily for the benefit of employees" other than the restricted group, does it have to make that pool available to all its employees throughout the country, from Portland, Maine, to Anchorage, Alaska? We think that the question answers itself, and that Congress must have intended that a realistic interpretation be placed upon the words that it has used.

In our judgment, Congress was concerned that the recreational facilities be used primarily by employees generally, in contrast to highly-paid employees, officers, and others in the so-called restricted group. So long as the

recreational events are primarily for "employees" other than those in the restricted group, we think that Congress did not intend to prohibit some sort of *reasonable* classification of otherwise eligible employees, based, for example, upon the nature of their work, where they work, or the limited number of persons that can be accommodated by the particular recreational facility. Indeed, the last sentence of section 1.274-2(f)(2)(v) of the regulations provides that:

an expenditure for an activity will not be considered outside of this exception merely because, due to the large number of employees involved, the activity is intended to benefit only a limited number of such employees at one time provided the activity does not discriminate in favor of officers, shareholders, other owners, or highly compensated employees.

Thus, the IRS itself recognizes that section 274(e)(5) may be applicable even where "the activity is intended to benefit only a limited number * * * of employees at one time" because of "the large number of employees involved." The Government attempts to get around this regulation by calling attention to the words "at one time," and in this connection it relies upon *Termicold v. United States,* 2 Cl. Ct. 351 (1983), apparently the only reported case concerned with this problem. There the corporate employer acquired a 36-foot pleasure boat which slept six persons. It restricted its employees' use of the boat in such manner as to wholly exclude a comparatively large number of employees, both full-time and part-time, and the only employees entitled in fact to schedule the use of the boat and enjoy it were the employer's 26 officers and highly compensated employees, i.e., members of the restricted class. In the course of its opinion, the Claims Court referred to the foregoing regulation, emphasizing the words "at one time." But that case is sharply distinguishable from the present case. There the only employees fully authorized to partake of the recreational opportunities were those covered by the parenthetical provision of section 274(e)(5) "other than employees who are officers, shareholders or other owners, or highly compensated employees" which limited the meaning of the words "primarily for the benefit of employees." Moreover, even if the Government's position were to be accepted in respect of the words "at one time," we fail to see how it would be

possible or feasible even over the extended period involving the 49 cruises in this case, to accommodate some 13,000 temporary outside employees in addition to the 80 to 128 permanent office workers, bearing in mind that the boat had only 25 to 35 available spaces and that some of them (a minority) were taken by members of the restricted group and their guests.

Plainly, a reasonable classification of eligible employees, whether by time when the recreational facilities may be enjoyed, by nature of the work, etc., would appear to be within the provisions of section 274(e)(5). The reasonableness of such classification here is underscored by petitioner's executive committee's concern about the lack of desirable social interaction between its employees in its many scattered satellite offices and those in its central office including its managerial and executive employees. No such concern would appear to relate to the approximately 13,000 temporary employees, who obviously played no part in the day-to-day conduct of petitioner's affairs, apart from merely accepting an assignment to render temporary services to petitioner's customers.

Finally, the reasonableness of treating the permanent in-house employees differently from petitioner's disproportionately large number of temporary employees becomes particularly apparent when one considers the nature of the work performed by the employees in this case and the nature of the employer's business. Obviously, the composition in membership of that large group of temporary employees was in constant or at least frequent change. But of even greater significance, the temporary employees were, in every real sense, as argued by petitioner, its "stock in trade." It "sold" them to its customers for temporary services. Their function was wholly unlike that of petitioner's permanent staff, and we think a reasonable classification could be made here to limit the enjoyment of the recreational activities to petitioner's permanent staff without running afoul of the restrictions in section 274(e)(5). We so hold.

A final note. We hasten to point out that, although we decide as a matter of law that a proper interpretation of section 274(e)(5) does not require in absolute terms that the recreational activities be made available to *all* employees without exception, provided that the selection of eligible employees is made on reasonable grounds, the application of the reasonableness criteria here depends entirely upon the facts of this case and should not necessarily be considered a precedent in other factual situations.

*Decision will be entered for the petitioner.*

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect as of the date of decedent's death.