TEXAS LEARNING TECHNOLOGY GROUP, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18585-89X. Filed April 30, 1991.

*Leonard J. Henzke, Jr.,* and *William J. Lehrfeld,* for the petitioner.

*Ronald B. Weinstock,* for the respondent.

## OPINION

TANNENWALD, *Judge:* Respondent denied petitioner's application for recognition as a nonprivate foundation within the meaning of section 509(a)(1).[1] The issue for decision is whether petitioner qualifies as a nonprivate foundation under section 509(a)(1) because it is a political subdivision of a State as described in section 170(b)(1)(A)(v) and (c)(1).[2]

This case was submitted under Rule 122. The parties have filed a joint stipulation as to the completeness and genuineness of the administrative record, and the evidentiary facts and representations contained in the administrative record are presumed to be true for the purpose of this proceeding.

Petitioner's principal place of business, at the time the petition herein was filed, was in Austin, Texas.

Petitioner is an unincorporated intergovernmental cooperative organization created on October 1, 1985, pursuant to the Interlocal Cooperation Act, Tex. Rev. Civ. Stat. Ann. art. 4413 (32c) (Vernon 1976).

Petitioner was established pursuant to interlocal agreements involving 11 Texas public school districts.[3] As stated in these agreements and its bylaws, petitioner was created to formulate, develop, and administer programs on behalf of group member school districts which will assist in the improvement of student learning in public institutions in Texas and to further implement the purposes and objectives of the Tex. Educ. Code Ann. sec. 13.501 (Vernon Supp. 1990), which provides:

(a) The legislature finds that the economic well-being of Texas and the United States, including our competitiveness in national and world markets, is increasingly dependent on technology and will require a citizenry that possesses general and specific skills in mathematics,

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code as amended and in effect for the years in issue, and all references to Rules are to the Tax Court Rules of Practice and Procedure.

[2]The applicability of secs. 509(a)(2) and (3) and 170(b)(1)(A)(vi) was involved in the administrative proceeding but no issues involving these sections are before the Court in this proceeding. Petitioner also received a tentative ruling from respondent granting it "foundation status classification" under secs. 509(a)(1) and 170(b)(1)(A)(vi) during the period from Sept. 30, 1985, to Aug. 31, 1990, but no issue as to such status is involved herein.

[3]The parties have stipulated that a public school district of the State of Texas is a "political subdivision" of the State within the meaning of sec. 170(c)(1). These school districts (group members) are authorized to enter into an interlocal agreement by the Interlocal Cooperation Act (Act), Tex. Rev. Civ. Stat. Ann. art. 4413(32c) (Vernon 1976).

science, computer science, and related technological subjects. The public schools are responsible for imparting these skills to students but are increasingly unable to meet this obligation successfully because of a decline in the number of qualified and certified persons seeking to teach these subjects.

(b) It is the purpose of this subchapter to increase the ability of local school districts to provide secondary students with quality instruction in mathematics, science, computer science, and related technological subjects. Therefore, local school districts are authorized and encouraged to establish programs to cooperate with the business community and with other educational and governmental institutions to recruit qualified persons who will provide secondary students with the skills and training essential for the technological age.

The interlocal agreements provide that petitioner fund, organize, and manage projects designed to improve curriculum or otherwise enhance the quality of scholastic education in Texas.

Petitioner is governed by a board of directors of 15 members. Five members, who must be members of public school boards of the group members, are appointed by the president of the Texas Association of School Boards (TASB), a tax-exempt organization under section 501(c)(3); five members, who must be school administrators of group member public school districts, are appointed by the president of the Texas Association of School Administrators (TASA), a tax-exempt organization under section 501(c)(6). Two members are appointed by the Texas State Board of Education; the Texas Governor, Lieutenant Governor, and speaker of the House of Representatives each appoint one member. All appointments made by the president of the TASB and the president of the TASA are submitted to group member school districts for ratification; if a group member school district fails to act within 30 days, it is presumed to have ratified the appointment. A majority of the group member school districts may reject any appointment within the 30-day period.

To date, petitioner and certain Texas public school districts have organized the ninth grade physical science curriculum project (project) to develop and redevelop the current ninth grade physical science curriculum used in Texas public schools. Under the project agreement, petitioner entered into a contract (contract) with the National

Science Center for Communications and Electronics Foundation, Inc. (foundation), a section 501(c)(3) organization, whereby foundation agreed to contribute $500,000 to the project and petitioner agreed to contribute up to $1,500,000 from participating school districts. The contract further provided that the project would be governed through a coordinating committee. Under the contract, the parties agreed that they would jointly own the products of the project; that petitioner would have the sole distribution rights to the products within the State of Texas, and, with respect to revenue generated by the project within Texas, petitioner would receive 75 percent and foundation 25 percent of gross revenue. Foundation was given the right to distribute the project products through the Learning and Information Network Center (LINC), or its successor, subject to petitioner's approval of the fees charged for such distribution, petitioner to receive 25 percent and the foundation 75 percent of the gross revenue for such distribution outside Texas. The contract gave petitioner the right to enter into agreements with third parties to distribute, redevelop, revise, or commercially exploit the products of the project, both within and outside the State of Texas, except insofar as those rights already granted, subject to foundation's approval. The gross revenue from such third-party agreements was to be distributed 75 percent to petitioner and 25 percent to foundation.

The initial and continuing design for the physical science project is a collaborative effort of Texas public school teachers, Texas public school administrators, Texas public school employees who are physical science or curriculum specialists from Texas public school districts, and the foundation. Short-range practical objectives to be accomplished by petitioner include: (1) The development of a comprehensive physical science curriculum which has a technology-based delivery system using integrated computer, video, and audio technology components; (2) the improvement of instruction in various physical sciences by changing the role of the classroom teacher by accommodating various new learning styles and by varying the methodology for instruction to include student active participation and individual instruction; and (3) the evaluation of the

effectiveness of this type of delivery method versus the traditional physical science teaching methods.

Since the initiation of the project, classroom teachers from participating Texas public school districts have been actively involved in the development of a realistic workable physical science curriculum. The contributions of public school teachers have materially assisted in the determination of what objectives and activities should be included in any design and hardware for a physical science course. The entire physical science curriculum as it develops includes a teacher resource guide, student user manual, end-of-unit tests, text content for videodiscs, and a classroom management system.

Petitioner has sold, and intends to sell and otherwise distribute and display, its physical science curriculum to all public school districts in Texas. To the extent permitted by Texas law, petitioner will retain all right, title, and interest in the curricula developed, and under development, so as to permit it to sell or license various components of the physical science curriculum to third parties worldwide. As between petitioner and the participating group member school districts, petitioner has the exclusive right to sell, lease, rent, license, exhibit, or commercially exploit project products. Project revenues first will be used to pay for project development costs; any remaining funds will be returned to each participating group member school district until such payments reach 125 percent of the participating group member school district's project contributions. Petitioner may use revenues not returned to participating group member school districts for any purpose (including temporary investments) consistent with the interlocal agreements.

Petitioner will fund, organize, and manage different projects designed to integrate new technologies into the schools of its member school districts. Each project must be consistent with petitioner's purposes and objectives as provided in the interlocal agreements and its bylaws. Each member school district will have an option to participate in particular projects by entering into a separate interlocal project agreement with petitioner. Should a member school district decide to participate in a particular project, it will be required to contribute additional funds in accordance

with the applicable interlocal project agreement. The amount of money necessary for a member school district to contribute to any project will vary with the project and will be determined by the board. The distribution of funds contributed by group members for specific projects is also governed by the applicable interlocal project agreement.

Each group member public school district must pay $500 per year to petitioner in annual dues and also contribute funds for specific group projects in which it participates. Each project must be consistent with petitioner's purposes and objectives as provided in the interlocal agreements and its bylaws. Petitioner may not operate at a deficit without the prior approval of the group members who are obligated to fund any deficit. Funds raised by petitioner are used for programs and expenses that otherwise would be financed by its group member school districts.

Petitioner is presently financially dependent on its group member school districts' annual contributions and contributions to petitioner's projects in which they participate. In the future, petitioner intends to finance its operations in revising curriculum and begin development of subsequent subjects in substantial part through funds earned from marketing the instructional material it develops within Texas and throughout the United States, as well as from an endowment fund financed by private and public contributions and payments. Petitioner further intends to enter into some sort of royalty arrangement with third parties to market its instructional materials outside Texas.

Petitioner is not formally incorporated and its assets therefore technically belong to its member school districts. Upon its dissolution, petitioner's assets will be distributed to its group member school districts.

Petitioner has no power of eminent domain, no power to levy or collect taxes, and no power to issue government bonds.[4]

On June 5, 1987, respondent issued a determination letter recognizing the tax-exempt status of petitioner under section 501(c)(3). On October 26, 1988, respondent issued a

---

[4]The parties have so stipulated. The existence of police powers is not included in this stipulation, but there is no evidence of record that petitioner possesses any such power and petitioner does not contend that it does.

preliminary or tentative determination that petitioner did not qualify for classification as other than a private foundation under sections 509(a)(1) and 170(b)(1)(A)(v) because it had not been granted any of the generally acknowledged sovereign powers, stated to be the power to tax, the power of eminent domain, and the police power. On April 27, 1989, respondent issued a final adverse determination as to petitioner's private foundation classification under section 509(a)(1), holding that petitioner was not an organization described in section 170(b)(1)(A)(v) and (c)(1), because it was not a political subdivision of the State of Texas. After exhausting its administrative remedies, petitioner has petitioned this Court for a review of respondent's determination.

At the outset, we note that petitioner's tax-exempt status under section 501(c)(3) is not at issue. The sole issue herein is whether petitioner is a "political subdivision" under section 170(c)(1) and therefore is a "governmental unit" under section 170(b)(1)(A)(v) and entitled to be classified as a nonprivate foundation under section 509(a)(1).[5] Petitioner seeks such classification because of the benefits attendant thereto, particularly protection against the inhibiting effect on the grantor of the expenditure responsibility provisions of section 4945(d) and (h). See H. Rept. 98-861, 1984-3 C.B.

---

[5]Sec. 509(a)(1) provides:

(a) GENERAL RULE.—For purposes of this title, the term "private foundation" means a domestic or foreign organization described in section 501(c)(3) other than—

(1) an organization described in section 170(b)(1)(A) (other than in clauses (vii) and (viii));

Sec. 170(b)(1)(A)(v) provides:

(b) PERCENTAGE LIMITATIONS.—

(1) INDIVIDUALS.—In the case of an individual, the deduction provided in subsection (a) shall be limited as provided in the succeeding subparagraphs.

(A) GENERAL RULE.—Any charitable contribution to—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(v) a governmental unit referred to in subsection (c)(1),

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

shall be allowed to the extent that the aggregate of such contributions does not exceed 50 percent of the taxpayer's contribution base for the taxable year.

Sec. 170(c)(1) provides:

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

(1) a State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

(Vol. 2) 1, 344-345. For the reasons hereinafter set forth, we hold that petitioner is not a "political subdivision."

As a threshold argument, petitioner seeks sustenance from the fact that it is characterized as a political subdivision under the Texas Interlocal Cooperation Act, *supra,* and that this characterization is determinative for Federal income tax purposes. Assuming without deciding that Texas law by its terms so characterizes petitioner, we disagree with petitioner's position.

In *Burnet v. Harmel,* 287 U.S. 103, 110 (1932), the Supreme Court held that "State law may control only when the operation of the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law. * * * The state law creates legal interests, but the federal statute determines when and how they shall be taxed." The thrust of the language is that, while State law is an appropriate source for determining the particular entity, it is not conclusive as to the ultimate determination of the entity's taxable status. Cf. *Brown v. United States,* 890 F.2d 1329, 1337 (5th Cir. 1989); *Allied Fidelity Corp. v. Commissioner,* 572 F.2d 1190, 1192 (7th Cir. 1978), affg. 66 T.C. 1068 (1976). Petitioner's reliance on *United States v. Cambridge Loan & Building Co.,* 278 U.S. 55 (1928), and *La Caisse Populaire Ste. Marie v. United States,* 563 F.2d 505 (1st Cir. 1977), is misplaced. In our view, the references to "gross abuse" in those cases as the standard for rejecting the ultimate characterization of an entity under State law in determining that entity's status for Federal tax purposes, clearly was not intended to undermine the fundamental principle of *Burnet v. Harmel, supra.* Indeed, the Court of Appeals for the First Circuit recognized in *La Caisse Populaire Ste. Marie v. United States, supra,* that that principle was the underpinning of the Supreme Court's opinion in *Cambridge Loan & Building Co.* See 563 F.2d at 509. Similarly, *United States v. Cambridge Loan & Building Co., supra,* did no more than articulate that, if the designation of the entity under State law rested upon statutorily imposed requirements consistent with such designation, then the designation would be respected for purposes of the Federal income tax. As we stated in *Perpetual Building & Loan Association of Colum-*

*bia v. Commissioner,* 34 T.C. 694, 715 (1960), affd. per curiam sub nom. *Cooper's Estate v. Commissioner,* 291 F.2d 831 (4th Cir. 1961), a case relied upon by petitioner:

In our view, if a corporation does not substantially meet the generally recognized criteria of a bona fide building and loan association, it is not such a tax exempt association as is contemplated by the statute, regardless of what name it may have or how it may be designated or classified by the State statute under which it was organized. * * *

We now turn to the question whether petitioner is a political subdivision for Federal income tax purposes. Historically, the term "political subdivision" has been given a broad interpretation. *Estate of Shamberg v. Commissioner,* 3 T.C. 131, 137 (1944), affd. 144 F.2d 998 (2d Cir. 1944). That case involved the question whether the Port of New York Authority (authority) was a political subdivision within the meaning of section 22(b)(4) of the Internal Revenue Code of 1939 (now section 103) so that interest on the authority's bonds was excludable from gross income for Federal income tax purposes. In holding that such interest was so excludable, we emphasized the fact that the authority could exercise certain sovereign powers, i.e., the power of eminent domain and certain police powers, even though it could not exercise the power to levy taxes and assessments. See 3 T.C. at 143. This concept of sovereign power was the critical underpinning of our opinion. It is not significant that *Shamberg* dealt with a different code section from that involved herein, for we have found that Congress intended the term "political subdivision" to have no different meaning under section 170 from that under section 103, cf. *American Business Service Corp. v. Commissioner,* 93 T.C. 449, 456 (1989), and petitioner does not argue otherwise. Indeed, petitioner uses some of the language from our opinion in *Shamberg* to support its argument that the enumeration of sovereign powers therein is not exclusive.

The basic question herein is whether petitioner was authorized to exercise any power which could properly be characterized as "sovereign." We think that it was not. The parties have stipulated that petitioner did not have the two sovereign powers discussed in *Shamberg,* i.e., the power of

eminent domain and the power to levy or collect taxes,[6] and there is no evidence that it had any police powers. See *supra* note 4. These three elements have been considered the critical elements of sovereign power. In *Philadelphia National Bank v. United States,* 666 F.2d 834 (3d Cir. 1981), the Court of Appeals for the Third Circuit rejected the argument that Temple University was a political subdivision for purposes of section 103, finding that it did not possess any of the traditional sovereign powers of taxation, eminent domain, or police power. In so holding, the Court of Appeals stated:

> At most, the university has been given a limited authorization to exercise one small aspect of police power—one that has been delegated to private organizations as well. With such a minimal grant of police power, and with no eminent domain or taxing power, Temple cannot be said to be a political subdivision. [666 F.2d at 840.]

Petitioner argues that *Estate of Shamberg v. Commissioner, supra,* reflects the view that enumeration of the aforesaid three elements is not exhaustive of the powers which may properly be considered "sovereign." Petitioner may well have a point, but it does not follow that petitioner herein had any sovereign power, either the traditional three powers enumerated by the courts or any other. In this connection, it is essential to recognize that there is a critical difference between a sovereign power and a governmental function. A sovereign power always encompasses a governmental function, but it is one which inheres in a sovereign and is not exercisable by others without the sovereign's authorization. A governmental function, on the other hand, does not always constitute a sovereign power; it includes activities which are often more appropriately carried on by the sovereign but can alternately or additionally be carried on by others. Assuming without deciding that petitioner's powers were more than merely advisory under the Interlocal Cooperation Act, its activities at most fall within the category of a governmental function, i.e., the provision of

---

[6]In light of this stipulation, petitioner's suggestion that it has the power of taxation because it collects funds from member school districts, which presumably have the power to tax, is beside the point. In any event, such collection authority is a far cry from a delegation of the sovereign power of taxation. See *Philadelphia National Bank v. United States,* 666 F.2d 834, 839-840 (3d Cir. 1981).

education, and do not involve the exercise of any sovereign power.[7]

It may well be that it is not necessary that an entity exercise all of the three sovereign powers enunciated in the decided cases or which may otherwise exist. See 30 Op. Atty. Gen. 252 (1914). See also *Estate of Shamberg v. Commissioner,* 3 T.C. at 138-139. But, we think that it is essential that an entity be endowed with at least one of such powers. Clearly, petitioner does not qualify under this standard.

Petitioner also seeks to sustain its position by asserting that it is a State instrumentality and that the terms "instrumentality of one or more States" and "political subdivision" are synonymous. We disagree. Section 170(b)(1)(A)(iv), as originally enacted in 1962, dealt with the extent of charitable deductions for contributions made to endowments funds to State universities and provided:

> (iv) an organization referred to in section 503(b)(3) organized and operated exclusively to receive, hold, invest and administer property and to make expenditures to or for the benefit of a college or university which is an organization referred to in clause (ii) of this subparagraph and which is an agency or an *instrumentality of a State or a political subdivision thereof,* or which is owned or operated by a State or *political subdivision thereof or by an agency or instrumentality of one or more States or political subdivisions.* [Sec. 2, Pub. L. 87-858, 76 Stat. 1134; emphasis added.]

From the use of the disjunctive, it is clear that Congress viewed these terms as being separate. Thus, when Congress enacted section 170(b)(1)(A)(v) in the Revenue Act of 1964, section 209(a), Pub. L. 88-272, 78 Stat. 43, and, by reference to section 170(c)(1), used only the term "political subdivision," it did not intend to include within this provision the broader category of State agencies or instrumentalities.

As an alternative argument, petitioner contends that it is a "governmental unit" because it is an integral part of public school districts, which are political subdivisions. Again, we disagree. The authorities relied upon by petitioner deal with the "integral part" concept in the context

---

[7]In relying on *State Bank of Albany v. United States,* 276 F. Supp. 744 (N.D.N.Y. 1967), affd. 389 F.2d 85 (2d Cir. 1968), petitioner overlooks the fact that it was conceded that the New York Higher Education Assistance Corporation was a "political subdivision" of the State of New York. See 276 F. Supp. at 746.

of whether the entity involved is sufficiently related to another organization to be entitled to the benefit of the latter's tax-exempt status. But that issue is entirely different from that involved herein, i.e., whether an exempt organization such as petitioner is a "political subdivision." In resolving that question, the close relationship between two related organizations is irrelevant. Petitioner simply cannot combine its plea to be considered a separate entity and at the same time ask us to disregard that separateness in order to place it within the "political subdivision" characterization accorded its member school districts.

One final word. In articulating our position, we have refrained from parsing the various revenue rulings cited by the parties in support of their positions. Admittedly, these rulings are often less than concise and not entirely consistent. But, despite sentences and phrases to which the parties point, the fact of the matter is that not one of them in any way contradicts our analysis or our conclusion herein.

*Decision will be entered for the respondent.*